## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| BRIAN P. MANOOKIAN, | |
| *Plaintiff,* | |
| vs. | Civil Action No. _____ |
| FLOYD FLIPPIN, in his official and individual capacities; DANA DYE, in her official and individual capacities; JOHN KITCH, in his official and individual capacities; JOE LOONEY, in his official and individual capacities; ODELL HORTON, JR., in his official and individual capacities; RUTH ELLIS, in her official and individual capacities; JODY PICKENS, in her official and individual capacities; BRIDGET J. WILLHITE, in her official and individual capacities; and JIMMIE MILLER, in her official and individual capacities, | **JURY DEMAND** |
| *Defendants.* | |

---

## COMPLAINT

---

For his complaint, Plaintiff Brian P. Manookian alleges the following upon actual knowledge with respect to himself and his own acts, and upon information and belief as to all other matters:

## NATURE OF THE ACTION

The Tennessee Board of Professional Responsibility (BPR)—a quasi-public, quasi-private entity that regulates the practice of law in Tennessee—violated both

federal antitrust laws and the United States Constitution when it "temporarily" and indefinitely suspended Plaintiff Brian Manookian from practicing law more than seven months ago. The central, stated impetus for Mr. Manookian's suspension was his constitutionally protected out-of-court speech—an email to another lawyer—that the BPR claims it "took to be threatening" despite candidly acknowledging that it was not a true threat.

At the time the BPR sought Mr. Manookian's suspension, the BPR had been aware of his purportedly offending speech for approximately a month and a half. It had also opened a routine disciplinary investigation regarding that speech and afforded Mr. Manookian 60 days to respond. Suddenly, however—on September 19, 2018, just days before Mr. Manookian was to respond and almost immediately after Mr. Manookian sued a state court judge for defamation—the BPR changed course by seeking and securing an emergency temporary suspension through an *ex parte* proceeding without Mr. Manookian's involvement. Mr. Manookian's "temporary" suspension has since remained in effect for approximately seven months, and given its indefinite nature, it amounts to a de facto disbarment. Critically, Mr. Manookian's suspension was also approved and maintained by Mr. Manookian's active market competitors in the medical malpractice industry—including an attorney who was opposing counsel in a pending case from which Mr. Manookian was required to withdraw.

Since "temporarily" suspending Mr. Manookian from the practice of law, the BPR has taken extreme measures to keep Mr. Manookian's suspension in place. During the seven months that his suspension has been in effect, the BPR has also refused even to initiate a disciplinary petition against him alleging that he violated any underlying Rule of Professional Conduct. The BPR additionally rejected a conclusion from an approved referral of its own Tennessee Lawyers Assistance Program that Mr. Manookian is a highly skilled and successful lawyer who is fit for duty and poses no threat to the public. Instead, the BPR contends that Mr. Manookian can only show good cause to dissolve his suspension by admitting the BPR's legally baseless accusations—none of which has prompted an underlying petition for discipline—and submitting to the board for mercy. That is, the BPR continues to maintain Mr. Manookian's suspension even though no underlying petition for discipline has been filed against him and even though the BPR's own fitness for duty evaluation determined that Mr. Manookian poses no threat of substantial harm to the public.

In sum: The defendants sanctioned Mr. Manookian for his constitutionally protected, out-of-court speech and retaliated against him for exercising his First Amendment right to petition the government for the redress of grievances. The defendants further deprived Mr. Manookian of due process and equal protection under the law by violating their own procedures, abusing facially unconstitutional procedures, and suspending him in an *ex parte* proceeding in which he was neither

entitled to participate nor permitted to submit admissible evidence. Most prominently, though, defendants' conduct violated the Sherman Act. Defendants agreed to undertake a course of conduct designed to exclude a horizontal competitor from the market for legal services and from the medical malpractice industry in particular. Mr. Manookian's exclusion—unlike most professional suspensions—had an appreciable anticompetitive effect because he is one of approximately twenty competitors in the market for medical malpractice victim representation in Tennessee. That market has significant barriers to entry, and Mr. Manookian was one of the industry's top performers until he was suspended. Accordingly, Mr. Manookian's suspension significantly harms competition in the medical malpractice industry due to his outsized role among a tiny field of competitors in a constrained market.

Based on the foregoing, Mr. Manookian requests that this Court declare: (1) that defendants' conduct and the procedures they abused to retaliate against him for his protected speech are unconstitutional, and (2) that defendants' conduct violates the Sherman Act. Thereafter, this Court should enjoin the defendants from continuing their unlawful acts; it should order the defendants to vacate Mr. Manookian's temporary suspension; and Mr. Manookian should be awarded compensatory and punitive damages, his reasonable attorneys' fees, and costs.

4

## JURISDICTION AND VENUE

1.     The Court has primary subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, 1343, 1367, 2201, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, because this action arises under the U.S. Constitution and the antitrust laws of the United States.

2.     The Court has personal jurisdiction over each of the defendants because each defendant resides in Tennessee and has substantial, continuous contacts with Tennessee and in this district.

3.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action occurred in this district, and because defendants Dye, Kitch, and Looney reside within the Middle District of Tennessee. Venue is also proper under 15 U.S.C. § 15 and 22 because at least one defendant can be found in this district.

## PARTIES

4.     Plaintiff Brian Manookian is a U.S. citizen and resident of the State of Tennessee. Before the unlawful conduct alleged in this complaint, Mr. Manookian held an unrestricted license to practice law in the State of Tennessee. He is one of the state's most successful plaintiff's-side medical malpractice lawyers, having obtained collective recoveries for his clients worth more than $20 million in the year before defendants unlawfully suspended him from the practice of law.

5.     Defendant Floyd Flippin is the Chair of the Tennessee Board of Professional Responsibility and is responsible for its operations. He is sued in his individual capacity for compensatory and punitive damages and in his official capacity for prospective injunctive and declaratory relief. He may be served with process at his place of business, 1302 East Main Street, Humboldt, Tennessee 38343, or wherever he may be found.

6.     Defendant Dana Dye is a member of the Tennessee Board of Professional Responsibility. Defendant Dye served as the Chairperson of Hearing Panels I and II where she voted to deny the reinstatement of Mr. Manookian's law license. She is sued in her individual capacity for compensatory and punitive damages and in her official capacity for prospective injunctive and declaratory relief. She may be served with process at her place of business, 105 West End Avenue, Centerville, Tennessee 37033, or wherever she may be found.

7.     Defendant John Kitch is a member of the Tennessee Board of Professional Responsibility. Defendant Kitch served on Hearing Panel I where he voted to deny the reinstatement of Plaintiff's law license. He is sued in his individual capacity for compensatory and punitive damages and in his official capacity for prospective injunctive and declaratory relief. He may be served with process at his place of business, 511 Union Street, Suite 1500, Nashville, Tennessee 37219, or wherever he may be found.

8.    Defendant Joe Looney is a member of the Tennessee Board of Professional Responsibility. Defendant Looney served on Hearing Panels I and II where he voted to deny the reinstatement of Plaintiff's law license. He is sued in his individual capacity for compensatory and punitive damages and in his official capacity for prospective injunctive and declaratory relief. He may be served with process at his place of business, 156 Rector Avenue, Crossville, Tennessee 38555, or wherever he may be found.

9.    Defendant Jimmie Miller is the immediate past chairperson of Tennessee Board of Professional Responsibility and was responsible for its operations at the time of the illegal suspension of Plaintiff's law license. She is sued in her individual capacity for compensatory and punitive damages and her official capacity for prospective injunctive and declaratory relief. She may be served with process at her place of business, 1212 North Eastman Road, Kingsport, Tennessee 37664, or wherever she may be found.

10.    Defendant Odell Horton, Jr. is a member of the Tennessee Board of Professional Responsibility. He is sued in his individual capacity for compensatory and punitive damages and in his official capacity for prospective injunctive and declaratory relief. He may be served with process at his place of business, 6070 Poplar Avenue, Suite 300, Memphis, Tennessee 38119, or wherever he may be found.

11.    Defendant Ruth Ellis is a member of the Tennessee Board of Professional Responsibility. She is sued in her individual capacity for compensatory

and punitive damages and in her official capacity for prospective injunctive and declaratory relief. She may be served with process at her place of business 550 Main Street, Suite 750, Knoxville, Tennessee 37902, or wherever she may be found.

12. Defendant Jody Pickens is a member of the Tennessee Board of Professional Responsibility. She is sued in her individual capacity for compensatory and punitive damages and in her official capacity for prospective injunctive and declaratory relief. She may be served with process at her place of business 226 Anne Dallas Dudley Blvd., Suite 800, Nashville, Tennessee 37243, or wherever she may be found.

13. Defendant Bridget J. Willhite is a member of the Tennessee Board of Professional Responsibility. She is sued in her individual capacity for compensatory and punitive damages and in her official capacity for prospective injunctive and declaratory relief. She may be served with process at her place of business 1 W Madison Avenue, Athens, Tennessee 37303, or wherever she may be found.

14. By prior agreement, each of the defendants may also be served, in their individual capacities, through Rita Webb, the Executive Secretary of the Tennessee Board of Professional Responsibility, and, in their official capacities, through the Office of the Tennessee Attorney General.

15. Each defendant acted as the principal of or agent for each other defendant as to the acts, violations, and common course of conduct alleged in this complaint.

8

16.     Defendants and their agents participated personally in the unlawful conduct challenged in this complaint and, to the extent they did not personally participate, they authorized, acquiesced, set in motion, or otherwise failed to take necessary steps to prevent the acts complained of in this complaint.

## SUBSTANTIVE ALLEGATIONS

### Mr. Manookian's Law Practice

17.     Mr. Manookian is a highly skilled and successful lawyer who has practiced law in Tennessee for over a decade. He graduated with honors from Vanderbilt Law School on scholarship in 2007.

18.     Mr. Manookian applied for admission to the Tennessee bar after graduating from law school, he passed the bar examination, and he cleared a thorough character and fitness investigation. The Tennessee Board of Law Examiners certified that Mr. Manookian was "a person of good moral character, of proper age, and well versed in the law and its practice," and based on that conclusion, it issued Mr. Manookian an unrestricted license to practice law in the State of Tennessee.

19.     Upon his admission to the bar, Mr. Manookian was employed by a law firm specializing in the defense of healthcare providers. He gained substantial experience at the intersection of law and medicine, representing hospitals, physicians, and healthcare systems in complex and high-stakes cases in Tennessee and throughout the nation.

9

20. In 2015, Mr. Manookian co-founded the law firm Cummings Manookian PLC. Since that time, Mr. Manookian's law practice has focused on representing plaintiffs in complex and catastrophic injury cases, particularly in cases of healthcare liability and medical malpractice. The overwhelming majority of his medical malpractice matters are taken on a contingency fee basis, meaning that he is compensated only if he prevails on behalf of his client.

21. By any objective measure, Mr. Manookian has been enormously successful in his practice of law as a plaintiff's-side medical malpractice attorney. He makes up much of the volume of complex medical malpractice claims in the State of Tennessee. Since 2015, Mr. Manookian has secured tens of millions of dollars in actual, paid recoveries for his clients. He has done so in a uniquely difficult area of law, representing victims without financial resources against institutional and large corporate defendants in cases where the outcome is the ultimate indicator of capability. Thus, as one of the most successful lawyers among only approximately twenty existing participants in the market for plaintiffs' medical malpractice representation in the State of Tennessee, Mr. Manookian's suspension has a genuine, significant, and appreciable negative impact on competition.

22. Mr. Manookian's practice and skill have been recognized within the industry and by the public. He has been selected for myriad merit-based awards by publications such as Super Lawyers and the National Law Journal. He is peer-review rated AV Preeminent by Martindale-Hubbell for his legal ability and high ethical

standards. In 2016, Mr. Manookian served as the invited Key Note Speaker for Harvard Law School's annual symposium on legislation. He is frequently cited and quoted by the media as an authority in the area of health care litigation.

23.     Mr. Manookian's success has been the result of hard work, skill, and substantial investment in perfecting his trade and business. He has committed years of education, tens of thousands of hours, and millions of dollars toward that end. His livelihood is the practice of law, and he has a protected property right in both his license to practice law and his right to earn a living.

24.     As of September 18, 2018, Mr. Manookian held an unrestricted license to practice law. He had never been the subject of public discipline for his conduct as a lawyer. Nor had Mr. Manookian had a single formal or informal disciplinary complaint lodged against him by a client. Mr. Manookian's law practice was generating millions of dollars in annual revenue at a firm he founded for the purpose of representing victims of wrongful conduct. His livelihood as an attorney was lucrative, professionally rewarding, and personally satisfying.

### The Tennessee Board of Professional Responsibility

25.     The BPR is an administrative agency of the judicial branch of the State of Tennessee that is tasked with regulating the legal profession in the State of Tennessee. Among other things, it investigates and adjudicates lawyer disciplinary matters. The BPR is composed of twelve members who are nominated in a private, opaque process and appointed by the Tennessee Supreme Court. Under Tennessee

Supreme Court rules, nine BPR members must be engaged in the active practice of law in the State of Tennessee. Three other "public" members—only one of whom is required to be a non-lawyer—are appointed as well. Rule 9, § 4.1.

26.     The BPR is dominated by active market participants in the legal industry who conduct official government business in almost uniformly private "executive sessions" without accountability to either the public or the professionals they regulate. The BPR is neither a judicial system nor a judicial entity. Its members are not state employees, judicial officers, state prosecutors, or legislators. Nevertheless, the BPR and its members are empowered to take adverse disciplinary action against their peers—other lawyers who compete against them—under color of state law.

27.     Each defendant is a member of the BPR and a Tennessee-licensed lawyer engaged in the for-profit, private practice of law. Mr. Flippin is the current chairperson of the BPR, and Ms. Miller is the immediate past chairperson of the BPR. Each lawyer member of the board is a direct competitor of Mr. Manookian, and both Mr. Flippin and Ms. Miller are malpractice defense lawyers. Critically, Mr. Flippin also ***had active cases as opposing counsel to Mr. Manookian*** until Mr. Flippin and his colleagues forced Mr. Manookian to withdraw from those cases as a result of his temporary suspension. Thus, Mr. Flippin and Ms. Miller—in addition to their status as market participants and competitors—have a direct and immediate

pecuniary interest in Mr. Manookian's suspension, posing a serious actual conflict of interest and the appearance of one.

28.     Many of the BPR's activities are not actively supervised by the State of Tennessee, as sovereign. The defendants and their agents, in their sole discretion, choose whom to investigate, charge, and discipline for what conduct. Some of the BPR's decisions are reviewed by the Tennessee Supreme Court based upon a deferential standard in favor of the BPR and its recommendations after a public, adversarial hearing process and review by a lower judicial tribunal. Other BPR decisions—like Mr. Manookian's temporary suspension—are affirmed directly by the Tennessee Supreme Court and in their entirety on a summary basis without any review of the underlying hearing record or any prior judicial review.

## Summary of the Board's Unlawful Conduct

29.     On September 18, 2018, Mr. Manookian filed and served a defamation lawsuit against Judge Michael Binkley for making false and defamatory remarks about Mr. Manookian at a public hearing in a case not involving Mr. Manookian. Mr. Manookian issued a lawful subpoena to the BPR on the same day.

30.     The next day, September 19, 2018, the BPR filed a petition for emergency temporary suspension claiming that Mr. Manookian represents a substantial threat to the public. Such a suspension can be obtained on an ex parte basis without providing the respondent due process of law, but it must be supported by an affidavit attesting to personal knowledge of the facts alleged.

31.     According to BPR disciplinary counsel William Moody, the central impetus for Mr. Manookian's temporary suspension was an email that Mr. Manookian had sent to another lawyer that the BPR "took to be threatening." Apart from being protected, out-of-court speech, the BPR had been aware of the email since before it originally opened a complaint into the matter August 8, 2019. In fact, the BPR allowed Mr. Manookian until at least September 21, 2018 to respond. The Board did not consider the email an emergency at the time.

32.     The BPR was actually aware that Phillip North—the recipient of the purportedly threatening email—had voluntarily met with Mr. Manookian several times since he received the email that the BPR claims it "took to be threatening." For example, North voluntarily attended a deposition where he was not counsel, a party, or witness and where he knew Mr. Manookian would be present.

33.     That is, just a single day after Mr. Manookian sued a judge and issued the BPR a lawful subpoena, the defendants initiated an emergency temporary suspension against Mr. Manookian based on conduct that it was already investigating in the normal course on a non-emergency basis—only to short circuit its normal process and petition for an emergency suspension of Mr. Manookian's license to practice law before Mr. Manookian's response was due.

34.     The BPR was aware of the optics that would reflect its unlawful motives. It was also aware that Mr. Manookian's out-of-court speech was entitled to full First Amendment protection. As a result, it attempted to trump up its petition by including

years-old and in some cases decades-old examples of alleged misconduct dredged up from, for example, police records about an altercation between Mr. Manookian and a friend from 2004—years before he was deemed to have good moral character and fitness for the bar—and from Mr. Manookian's divorce records.

**The Sham Impetus: Mr. Manookian's Email to Phillip North**

35.     On June 20, 2018, Mr. Manookian was taking a deposition in a medical malpractice case, Shao v. Smith, in Tennessee state court, in which he represented the plaintiff. The defendant, a physician, was represented by lawyer Phillip North. During the deposition, Mr. Manookian received a voicemail from Phillip North's brother, who is a retired county judge, Steve North. The voicemail stated:

> Brian, this is Steve North. I read with interest the article in the Nashville Post with regard to your controversy with Judge Brothers. I have some information that be of some help to you, and if you would give me a call at [number] I would be happy to discuss it with you. Thank you.

36.     Judge North was referring to an article about Mr. Manookian's motion for recusal of a current county judge, Judge Thomas Brothers, who was presiding over the Shao case. Mr. Manookian returned Judge North's call the same day. Judge North provided Mr. Manookian concerning information about Judge Brothers that bore on Mr. Manookian's motion for recusal.

37.     Mr. Manookian—who had never met Judge North—did not want to proceed based on the information provided to him without first authenticating its

source. As a result, Mr. Manookian sent the voicemail to Phillip North and asked him to confirm that the voice in the recording was his brother, Judge North.

38.     As a business practice at his law firm, Mr. Manookian uses software that determines when emails and attachments have been opened by recipients. Phillip North did not respond to Mr. Manookian's email, but he opened the email and the attached recording repeatedly. Accordingly, Mr. Manookian emailed Phillip North again and asked him a second time to confirm whether Judge North was, in fact, the speaker in the voicemail.

39.     Again, Phillip North did not respond. However, Judge North did. Judge North stated that he had seen Mr. Manookian's characterizations of what Judge North had said and believed that those characterizations were not accurate.

40.     Mr. Manookian was unsure what to think: Judge North—someone he did not know personally—had contacted him to provide information implicating another judge as having engaged in improprieties bearing directly on a pending motion for recusal. Now, however, Judge North appeared to be retracting his claims.

41.     Mr. Manookian replied by recounting details of what Judge North had said, and he copied members of the press in the hopes of either compelling an honest response or relying on the fourth estate to ferret out the accuracy of his statements and vindicate the public interest. He wrote:

Phillip,

I see that my email and attachments are being repeatedly opened at the IP address associated with the consumer Comcast cable account for [address], Madison, Tennessee.

That address is the residential property where you have consistently lived with your parents (other than for a brief period of time from 1984-1986 where you rented unit [number] at [address]) until the North Family Trust essentially gifted you the property for $10.00. Upon investigation, this gifted piece of property in North Nashville, given to you for $10 by your parents, represents the sole piece of real property you own at 68 years of age.

Further confirming that you have read my email, records additionally reflect that Mona Dale Cornwell North -- the woman for whom you left your wife and two minor daughters (Nicki and Neely) -- has registered a Jeep Grand Cherokee ([VIN], TN License Plate [number]) at the same address your parents gave you and where my email is being viewed.

Please simply reply and confirm your brother Steve North's voice.

42.     Thereafter, on August 7, 2018, Phillip North's counsel forwarded the email to the BPR. An investigation was opened in the normal course. A month and a half later, however—nearly immediately after Mr. Manookian filed a defamation lawsuit against a judge and issued the BPR a lawful subpoena regarding that lawsuit—the BPR abruptly stated that Mr. Manookian's emails to the Norths constituted a substantial harm to the public warranting an emergency suspension.

**BPR's Attempt to Falsely Paint Manookian as Violent**

43.     To shore up its allegations, the BPR's petition included various other examples of older, unrelated allegations about Mr. Manookian's conduct that were designed to paint a wildly inaccurate picture of Mr. Manookian. Among them, the

17

BPR dredged up abandoned allegations made by Mr. Manookian's ex-wife in divorce proceedings several years before; a fight that Mr. Manookian had with a friend in college approximately a decade and a half ago; and a separate email sent to a different colleague, which the BPR had had in its possession for more than a year. Nonetheless, the BPR stated that the central, claimed basis for Mr. Manookian's temporary suspension was the above-described email correspondence with Phillip North.

44.     The BPR failed to disclose that the bulk of its allegations had occurred either before Mr. Manookian was a lawyer; had been known to the BPR for months or years without prompting any action; or were otherwise unproven, withdrawn, dismissed, expunged, or wholly unsubstantiated.

45.     For example, in one case relating to a restraining order in a business dispute, the BPR itself had reviewed the matter and specifically found that "much of the alleged conduct, if proven to be true, would not constitute a violation of the Rules of Professional Conduct." Thus, despite previously clearing Mr. Manookian regarding that matter, it used the same claims against him to retaliate against him for protected speech.

46.     The BPR even went so far as to assert that a 2004 altercation between Mr. Manookian and a friend—while undergraduates—demonstrated that Mr. Manookian has a history of violence. The person with whom Mr. Manookian fought was and is a close personal friend and is now his client. More importantly, the BPR was aware of the incident when Mr. Manookian applied for admission to the bar, and

it determined that Mr. Manookian was of good moral character and fit for duty as a lawyer.

47.     Not a single one of the allegations that the BPR made in its petition for temporary suspension involved a complaint by one of Mr. Manookian's clients. Nor did a single one of the BPR's allegations evidence any harm to one of Mr. Manookian's clients. To the contrary, only the BPR's suspension has harmed Mr. Manookian's clients by forcing him to withdraw from their cases and find new counsel.

## The BPR's Suspect Conduct and Motivations

48.     As explained above, the BPR changed course and sought an emergency suspension of Mr. Manookian's license to practice law just a single day after Mr. Manookian sued a judge and issued the BPR a lawful subpoena. Its allegations were also based on existing disciplinary complaints that had been proceeding normally and that the BPR had conceded by its own actions were neither emergent nor exigent.

49.     The two defendants who ratified, authorized, and continue to authorize the BPR's course of action—Mr. Flippin and Ms. Miller—are competitors in the same narrow service market as Mr. Manookian. Critically, Mr. Flippin was also opposing counsel to Mr. Manookian in one or more active cases at the time the BPR suspended Mr. Manookian.

50.     Mr. Flippin materially benefitted from Mr. Manookian's temporary suspension, because it forced the withdrawal of one of his most formidable adversaries from pending and future cases.

51.     Since securing Mr. Manookian's "temporary" suspension, the BPR has
repeatedly defended the suspension from Mr. Manookian's motions to dissolve it. Yet
more than seven months later, it has not even initiated an underlying disciplinary
complaint regarding the supposed violations that necessitated Mr.
Manookian's suspension.

52.     There is abundant evidence that the "substantial harm to the public"
that the BPR has alleged to justify Mr. Manookian's suspension does not exist. At the
request of the BPR, Mr. Manookian underwent an exhaustive fitness for duty
evaluation approved by the Tennessee Lawyers Assistance Program (TLAP). Mr.
Manookian was cleared; it found he is a successful and skilled attorney who does not
suffer from any form of major mental illness and that there is no objective evidence
that he represents a danger to the public. The BPR was thus unwilling to accept the
conclusions of the TLAP program to which they themselves refer lawyers. Instead, it
demanded the underlying confidential and privileged reports, falsely claimed that
Mr. Manookian objected to their production because he wanted to conceal negative
aspects of the reports, and baselessly rejected the judgment of trained medical
professionals on the basis that TLAP had not been able to review the underlying
doctors' reports.

53.     Months after the panel raised questions about the report's findings,
TLAP's executive director testified under oath at a dissolution hearing that it had

read both doctors' reports and that its conclusions remained the same: Mr. Manookian does not pose a threat of harm to the public.

54.     Despite the fact that Mr. Manookian has been declared fit for duty, the BPR concluded that Mr. Manookian had the duty to show good cause for dissolution of the suspension, and that his fitness for duty is insufficient to meet that burden. In effect, it determined that in order to establish good cause for dissolution, Mr. Manookian would first have to agree with and submit to the BPR's findings that his suspension was justified.

55.     The BPR's central, claimed basis for its temporary suspension under the Tennessee Rules of Professional Conduct is that Mr. Manookian poses a "substantial harm to the public" because he poses a threat of physical violence to Phillip North and his family. However, the BPR has not identified a single rule of professional conduct that Mr. Manookian violated, nor has it articulated any legitimate threat to *the public*. Even if the BPR had demonstrated a true threat to Phillip North—and it did not—such a claim would not have been sufficient to justify a temporary suspension. The BPR's purported basis for temporarily suspending Mr. Manookian's law license for seven months and counting is a sham.

56.     A temporary suspension is a drastic measure designed for severe and imminent threats to *the public*. It is an extraordinary remedy reserved for extraordinary circumstances; indeed, it must be, because it dispenses with traditional

due process protections for an accused lawyer—such as notice and a pre-deprivation hearing—in order to protect the public from imminent harm.

57. Temporary suspensions cannot be used to circumvent the process of a routine disciplinary case and cannot be used to punish—only to protect. A temporary suspension can endure only as long as necessary to safeguard the public from an actual, existing danger, and a hearing on the underlying conduct must proceed expeditiously once the temporary suspension has been granted.

58. The BPR has not even initiated a specific charge against Mr. Manookian in the underlying disciplinary investigations.

59. The types of conduct that justify a temporary suspension invariably involve direct, ongoing harm to the lawyer's clients or felony criminal conduct. Examples include the following:

    a. A lawyer's indictment on charges of theft by unlawful taking and theft by failure to make required disposition, and FBI received numerous other complaints against him after his arrest justified a temporary suspension. *Inquiry Comm'n v. Butler*, 514 S.W.3d 535 (Ky. 2017).

    b. Lawyer convicted of felony sale of controlled substances within a correctional facility was temporarily suspended pending resolution of appeal pending conviction and sentence. *Miss. Bar v. Jackson*, 904 So. 2d 109 (Miss. 2004).

c.  Lawyer who pled guilty to second-degree theft by deception was temporarily suspended pending final resolution of ethics proceedings against her. *In re Dade*, 609 A.2d 431 (N.J. 1992).

d.  Lawyer convicted of manslaughter and assault who had become addicted to drugs and other opiates and also neglected his law practice was temporarily suspended. *In re Strick*, 34 Cal. 3d 891 (1983).

e.  Lawyer convicted of receipt of child pornography committed sufficiently serious crime to warrant interim suspension pending final disposition of disciplinary proceedings. *In re Briggs*, 984 N.Y.S. 2d 172 (3d Dep't 2014).

60.     In Tennessee, with the sole exception of Mr. Manookian's suspension, temporary suspensions have uniformly involved a clearly articulated, imminent threat to the public. Specifically:

a.  A lawyer was temporarily suspended March 3, 2017 for theft of client funds to fund a gambling addiction. He was reinstated March 22, 2017.

b.  A lawyer was temporarily suspended August 16, 2018 because he misappropriated client funds and thus posed a threat of substantial harm to the public.

c. A lawyer was temporarily suspended January 16, 2018 because he failed to appear in court, his legal skills had "declined," and he had been abusing drugs.

d. A lawyer was temporarily suspended April 6, 2017 because he exchanged legal services for sex and was the subject of an ongoing federal corruption investigation.

e. A lawyer was temporarily suspended July 12, 2017 because his behavior and appearance in court gave a reasonable belief that his fitness to practice was impaired by drug abuse.

61. None of these cases involved a temporarily suspended lawyer as a consequence of his or her out-of-court speech.

62. The BPR has temporarily suspended Mr. Manookian for seven months and counting, and his "temporary" suspension remains one of indefinite duration. Because Mr. Manookian will not agree that his out-of-court, protected speech did not enjoy First Amendment protection, and because the BPR will not initiate a disciplinary petition regarding any supposed violation underlying his suspension, Mr. Manookian has been de facto disbarred from the practice of law in Tennessee.

63. Mr. Manookian has exhausted all administrative remedies, including by filing multiple petitions for dissolution of his temporary suspension, which to date have all been denied.

64.    The BPR takes the position that all previously determined matters may not be relitigated even under changed circumstances, foreclosing meaningful review.

65.    The BPR's administrative process does not allow Mr. Manookian to avert irreparable harm.

66.    The BPR's administrative process is inadequate and futile.

67.    The BPR is unable to grant an effective remedy or consider the issues presented.

68.    The BPR's administrative remedies are plagued by systemic failures as a consequence of their procedural unconstitutionality.

69.    Mr. Manookian's challenge to the BPR's administrative procedures themselves are not subject to exhaustion.

70.    The BPR's administrative process is tainted by unlawful agency bias and actual conflicts of interest.

**The BPR's Suspension Is Anticompetitive**

71.    Defendants' plan and agreement to exclude Mr. Manookian is a horizontal group boycott: an agreement among competitors—in this case, lawyers—to exclude another horizontal competitor from the market. This is per se illegal conduct under Sherman Act, Section 1. Mr. Manookian's exclusion—unlike other exclusions of a single competitor—appreciably harms competition because he is one of only approximately 20 participants in the market for plaintiffs' medical malpractice representation in the State of Tennessee.

25

72.     Mr. Manookian is among the most successful of plaintiff-side medical malpractice lawyers and makes up much of the volume of complex medical malpractice claims. That is, Mr. Manookian's involuntary removal from the market for plaintiff-side medical malpractice cases in Tennessee negatively affected competition itself because: (1) Mr. Manookian makes up a substantial part of this market, (2) Mr. Manookian is one of the highest-quality providers; and (3) there are significant barriers to entry into this market. Thus, plaintiff-side medical malpractice parties now have fewer and lower quality options following Mr. Manookian's suspension.

73.     Defendants' exclusion exceeded their authority under the rules of professional conduct, and the Tennessee Supreme Court did not actively supervise defendants' conduct such that it actually considered its anticompetitive character and effects. Indeed, defendants failed to disclose their conflicts of interest and the anticompetitive nature of their conduct to the Tennessee Supreme Court. Accordingly, defendants' conduct is not exempt from the antitrust laws under the state-action immunity.

**The Relevant Market**

74.     There are two possible relevant service markets. The first service market is the market for legal services. Any duly licensed Tennessee lawyer is authorized to provide legal representation on any type of matter within the State of Tennessee, provided that the lawyer is competent to do so.

75. The second service market, and the one most relevant here, is the market for plaintiff-side medical malpractice representation. Plaintiffs' medical malpractice representation in Tennessee has distinctive characteristics that separate it from other sectors of law practice.

76. The prosecution of medical malpractice cases requires highly specialized knowledge and experience, as well as massive labor and capital investments beyond that of typical litigation matters. Over the past decade, the Tennessee General Assembly has enacted increasingly high hurdles for plaintiffs seeking to bring claims against health care providers; requirements that range from mandatory pre-suit expert review to proof of localized standards of care and myriad other heightened evidentiary burdens. In practice, these additional statutory obligations ensure that even the most clear-cut cases of medical malpractice are subjected to vigorous, lengthy, and highly-technical defenses based upon both the law and the particularized medical care at issue.

77. As a result of Tennessee's statutory scheme, both defendants and plaintiffs require counsel who are experienced malpractice lawyers to adequately represent their interests. Victims of medical malpractice, in particular, are almost universally unable to afford even the incidental costs associated with initiating and maintaining a suit—expenses such as hiring physician experts to review and opine on their care—much less pay out-of-pocket for an attorney to represent them. Attorneys considering taking on such matters must be prepared to do so a contingent

basis, advancing enormous expenses, with no guarantee of ultimately being compensated for their work.

78.     The market for attorneys specializing in the prosecution of medical malpractice actions is minuscule. At the time of the acts giving rise to this Complaint, Mr. Manookian was one of approximately twenty lawyers in the entire State of Tennessee whose practice of law was dedicated primarily to the representation of victims of medical malpractice—a number that represents less than one-tenth of one percent (.1%) of all Tennessee-licensed attorneys.

79.     Medical malpractice representation thus does not have any close substitutes, and there is limited cross-elasticity of demand for other types of representation. Although a lawyer with a general litigation practice could represent parties in a medical malpractice case, they are unlikely to be capable of doing so with sufficient efficiency and effectiveness.

80.     The barriers to entry to the relevant market are insurmountably high for the overwhelming majority of lawyers. Detailed knowledge of both the substantive, specialized law and of highly localized standards of medical care across a vast number of specialties and procedures is necessary, but not sufficient. Lawyers seeking to represent plaintiffs in medical malpractice actions must also be willing to invest thousands of hours and risk hundreds of thousands of dollars in cases that can drag on for years—investments they may never recoup.

81.     The relevant geographic market is the State of Tennessee. Mr. Manookian is a Tennessee-licensed lawyer with a Tennessee-based practice. Law licenses are state specific; a lawyer licensed in one state cannot freely practice in another state, and to do so requires a different lawyer licensed in that state to serve, at a minimum, as local counsel.

82.     There is little substitutability or cross-elasticity of demand for services of lawyers outside the jurisdiction. Although lawyers are allowed to practice in other jurisdictions if they are sponsored by local counsel, lawyers in other jurisdictions would be particularly disadvantaged in Tennessee medical malpractice cases, which proceed according to a detailed, Tennessee-specific statutory scheme, and there would be additional costs, such as the necessity of local counsel. Thus, consumers seeking medical malpractice representation in the State of Tennessee typically do not hire lawyers outside the State of Tennessee. From a practical perspective, it is vanishingly rare for a non-Tennessee lawyer to lead a plaintiff-side case in this market. Indeed, because of the particularly stringent requirements and disadvantages for plaintiff-side medical malpractice plaintiffs, there is little incentive for out-of-state attorneys to come into Tennessee and develop this specialty, even with local counsel.

**Harm to Plaintiff and Competition**

83.     Defendants' conduct has harmed and continues to harm Mr. Manookian: In September 19, 2018, the BPR "temporarily" but indefinitely suspended him from practicing law in the State of Tennessee. Since then, Mr. Manookian has been harmed

and will continue to be harmed by significant economic and financial loss, the loss of current and future business, and reputational damage.

84.     Defendants additionally harmed Mr. Manookian by punishing him for his constitutionally protected, out-of-court speech and retaliating against him for exercising his First Amendment right to petition the government for the redress of grievances. Defendants deprived Mr. Manookian of due process and equal protection under the law by abusing facially unconstitutional procedures that allowed them to suspend him in a procedurally defective *ex parte* proceeding and despite their actual and perceived conflicts of interests regarding his suspension.

85.     Defendants' conduct has also harmed market competition. Unlike most exclusions of a single competitor, Mr. Manookian's exclusion appreciably harms competition in the medical malpractice industry because he is one of only approximately twenty participants in the market for plaintiff-side medical malpractice representation in Tennessee and because he is among the most successful of those lawyers and makes up much of the volume of complex medical malpractice claims. His suspension has a genuine and significant negative impact on competition.

86.     Thus, Mr. Manookian has suffered antitrust injury that flows from the defendants' harm to the market.

## State Action Immunity Does Not Apply

87.     The BPR is not a sovereign state entity within the federal system, but instead is a quasi-public, quasi-private entity that is primarily composed of practicing

30

lawyers who compete with Mr. Manookian. Defendants are participants in the relevant markets, and some of them fiercely compete with Mr. Manookian in medical malpractice cases. Indeed, they have obtained direct and immediate competitive advantages as a result of Mr. Manookian's exclusion.

88.    Defendants cannot invoke state-action immunity for their anticompetitive conduct because their conduct was not clearly articulated and affirmatively expressed as state policy, and it is not sufficiently supervised by the State of Tennessee as sovereign. To the contrary, defendants violated their own rules in excluding Mr. Manookian from the market and withheld critical, relevant information from the Tennessee Supreme Court regarding their anticompetitive behavior.

89.    The Tennessee Supreme Court's summary approval of the BPR's petition for dissolution and recommendations against dissolution do not constitute active supervision. Under U.S. Supreme Court case law, a state supervisor must have—and must actually exercise—the power to review the challenged decision and must analyze its anticompetitive effect. Here, even if the Tennessee Supreme Court wanted to conduct such a review, it would not have been able to do so because defendants failed to disclose critical material facts to the court, including, among other things: (1) that the current and former chairs of the board—the position that authorizes temporary suspension petitions—are direct competitors of Mr. Manookian; (2) that one of them directly benefitted competitively and monetarily

31

from Mr. Manookian's suspension; and (3) that Mr. Manookian is one of only approximately 20 plaintiff-side medical malpractice lawyers in the state, and among the most competitively successful.

## FIRST CLAIM
### 42 U.S.C. § 1983 – First Amendment Violation

90.     Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as if fully set forth at length herein.

91.     The First Amendment provides that Congress "shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for redress of grievances." The First Amendment is incorporated and binding against the states under the Fourteenth Amendment's Privileges and Immunities Clause.

92.     The U.S. Supreme Court has held that

> disciplinary rules governing the legal profession cannot punish activity protected by the First Amendment, and that First Amendment protection survives even when the attorney violates a disciplinary rule he swore to obey when admitted to the practice of law.

*Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1054 (1991).

93.     It has also said that state entities may only act to punish

> "true threats" [which] encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals.

*Virginia v. Black*, 538 U.S. 343, 359 (2003).

32

94.     Defendants' conduct has unlawfully restrained and punished Mr. Manookian's freedom of speech. The BPR's petition for temporary suspension, and its communications and actions relating to its enforcement, deprived Mr. Manookian of his protected property and liberty interests based on the content of his out-of-court speech.

95.     The speech in question is Mr. Manookian's email to Phillip North. The BPR claims that it "took it as threatening," but it failed to distinguish a true threat from constitutionally protected speech.

96.     Defendants cannot, as a matter of law, establish that Mr. Manookian's speech was a true threat that was unequivocal, unconditional, immediate, and specific as to the person threatened and conveyed a gravity of purpose and the imminent prospect of execution. It cannot establish that Mr. Manookian communicated any serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals.

97.     Defendants drew inferences from Mr. Manookian's speech that are not permissible under the true threat doctrine. Mr. Manookian's speech, viewed in its context, does not establish that Mr. Manookian intended to commit violence against Phillip North, his family, or anyone else.

98.     Mr. Manookian and Phillip North voluntarily attended depositions and other events without controversy after Mr. Manookian's purported threat. Mr. North

33

and Mr. Manookian have been in the same room on at least four occasions since the email.

99.    Moreover, defendants sought Mr. Manookian's suspension under pretext. The actual purpose of defendants' conduct was to retaliate against Mr. Manookian for exercising his First Amendment rights and remove him from the competitive market for legal services. More specifically, defendants retaliated against Mr. Manookian for exercising his right to petition the government by suing Judge Binkley for defamation and issuing the BPR a lawful subpoena.

100.    Defendants' actions cannot survive strict scrutiny. They had no compelling government interest in seeking a temporary suspension against Mr. Manookian. Moreover, temporarily suspending Mr. Manookian from the practice of law without due process or any meaningful adversarial hearing was not the least restrictive means of accomplishing any legitimate governmental objective.

101.    Mr. Manookian has suffered significant damages as a result of defendants' conduct, including direct economic losses of millions of dollars and additional damage to his reputation which, before defendants' conduct, was a reputation for being one of the state's most skilled and effective medical malpractice litigators.

102.    Mr. Manookian requests that the Court enter an order declaring defendants' conduct to be unlawful and that it enjoin defendants, in their official capacities, from continuing their retaliatory and unconstitutional course of conduct.

Moreover, Mr. Manookian requests compensatory damages against defendants sued in their individual capacities.

103.    Defendants' actions were intended to have, have had, and continue to have a chilling effect on Mr. Manookian's constitutionally protected speech; harming both Mr. Manookian and undermining recipients' right to hear and receive information. Unless defendants are enjoined, Mr. Manookian will suffer irreparable harm because he cannot exercise his constitutionally protected First Amendment rights without credible fear of continued and future reprisal.

**SECOND CLAIM**
**42 U.S.C. § 1983 – Due Process Violation**

104.    Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as if fully set forth at length herein.

105.    Lawyers have a protected property right in their law license such that attempts to restrict it require significant due process protections. *See Barry v. Barchi*, 443 U.S. 55, 64 (1979); *Mackey v. Montrym*, 443 U.S. 1, 10 n.7 (1979).

106.    In Tennessee, the right to earn a living is a fundamental right and a property right.

107.    Tennessee Rule of Professional Conduct Rule 9, § 12.3 is unconstitutional on its face and as applied because it deprives Mr. Manookian and others to whom it is applied of their property rights without due process of law.

108. As applied here, defendants deprived Mr. Manookian of his property right to practice law without a constitutionally adequate process, without presenting admissible evidence, and without meeting an adequate burden of proof.

109. Defendants and the BPR violated their own rules when petitioning for and approving Mr. Manookian's suspension, because the BPR failed to support the petition with an affidavit attesting to personal knowledge of each of the facts alleged.

110. Defendants relied on unauthenticated documents and hearsay devoid of context and circumstances that would disprove the BPR's self-serving narrative.

111. Defendants deprived Mr. Manookian of due process by suspending his license with the participation and leadership of BPR members who had a clear conflict-of-interest in that they and their clients directly benefited from Mr. Manookian's suspension.

112. More than seven months have passed since defendants "temporarily" suspended Mr. Manookian's law license. In that time, defendants have not proceeded with the underlying disciplinary proceedings that they claim formed the basis for Mr. Manookian's temporary suspension.

113. Defendants have twice rejected Mr. Manookian's petitions for dissolution by shifting the burden of proof for "good cause" to dissolve the suspension upon him.

114. The evidence presented by Mr. Manookian demonstrated that the basis for his suspension is not supportable.

115. There is no emergent threat to the public justifying Mr. Manookian's drastic, indefinite suspension.

116. Tennessee Rule of Professional Conduct Rule 9, § 12.3 unconstitutionally requires a temporary suspension to remain in place until such time as the BPR exercises its unfettered discretion to dissolve the suspension or until such time as the aggrieved lawyer meets a burden to show "good cause" for dissolution of the suspension.

117. Tennessee Rule of Professional Conduct Rule 9, § 12.3 provides no meaningful opportunity to be heard, and it contains no requirement that the underlying charges be prosecuted.

118. Thus, as occurred here, Tennessee Rule of Professional Conduct Rule 9, § 12.3 allows defendants to deprive any lawyer of his or her property interest indefinitely without ever having to meet their evidentiary burden in an adversarial proceeding.

119. Tennessee Rule of Professional Conduct Rule 9, § 12.3 is facially unconstitutional because there is no set of circumstances where the rule would provide adequate due process protections. It is also unconstitutional as applied to Mr. Manookian based on the defendants' failure to adhere to its own published processes and the actual and perceived conflicts of interest regarding him.

120. Mr. Manookian has suffered significant damages as a result of defendants' conduct, including direct economic losses of millions of dollars.

121. Mr. Manookian requests that the Court enter an order declaring that Rule 9, § 12.3 is unconstitutional both facially and as applied. He further requests that the Court enjoin defendants from utilizing the "good cause" standard of § 12.3 or otherwise placing the burden of proof on Mr. Manookian or others; enjoin defendants from taking emergent action against his law license without substantial, sworn evidence; enjoin defendants from violating their own procedural rules; and enjoin the defendants from suspending Mr. Manookian's law license based upon any evidence that is not admissible under the rules of evidence.

**THIRD CLAIM**
**42 U.S.C. § 1983 – Equal Protection Violation**

122. Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as if fully set forth at length herein.

123. The Fourteenth Amendment to the United States Constitution provides that a State shall not "deny to any person within its jurisdiction the equal protection of the laws."

124. Defendants "temporarily" but indefinitely suspended Mr. Manookian from practicing law, claiming that he represented a substantial threat of harm to the public.

125. Defendants' real purpose in suspending Mr. Manookian's law license was: (1) to retaliate against Mr. Manookian for exercising his constitutionally protected rights to free speech and to petition the government for the redress of

38

Case 3:19-cv-00350   Document 1   Filed 04/29/19   Page 38 of 43 PageID #: 38

grievances; and (2) to retaliate against Mr. Manookian to exclude one of the state's most successful medical malpractice lawyers from the market to the direct competitive and pecuniary benefit of the current and former chairpersons of the BPR.

126.     By doing so, defendants intentionally singled Mr. Manookian out for disparate treatment. Defendants' intentional disparate treatment of Mr. Manookian was not rationally based on any legitimate government interest.

127.     Defendants' conduct was driven by animus and ill will.

128.     Mr. Manookian has suffered significant damages as a result of defendants' conduct, including direct economic losses of millions of dollars and damage to his reputation.

129.     Mr. Manookian requests that the Court enter an order declaring Defendants' conduct to be unlawful and enjoin defendants, in their official capacities, from unconstitutionally retaliating against Mr. Manookian.

130.     Mr. Manookian requests compensatory damages against defendants sued in their individual capacities.

## FOURTH CLAIM
## 15 U.S.C. § 1 – Conspiracy to Restrain Trade

131.     Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as if fully set forth at length herein.

132.     Defendants' conduct violates Section 1 of the Sherman Act, 15 U.S.C. § 1, because the BPR, along with individual market-participant defendants, entered

39

into an agreement to exclude one of the state's most competitively successful medical malpractice lawyers, Mr. Manookian, from the market.

133. This agreement afforded direct competitive and pecuniary benefits to the current and former chairpersons of the BPR.

134. Defendants' agreement included their decision to sanction and punish Mr. Manookian with a "temporary" but indefinite suspension that excluded him from the market; to actively publicize that decision to the media; and to resist all efforts by Mr. Manookian to petition for dissolution of the suspension.

135. Defendants—Mr. Manookian's market competitors—reached an agreement to engage and did in fact engage in multiple overt acts to remove a fierce competitor from the market for pretextual reasons.

136. Defendants' conduct is a per se illegal violation of Section 1 of the Sherman Act because it involves a horizontal agreement among competitors to allocate markets and boycott and exclude a competitor, Mr. Manookian.

137. Alternatively, defendants' conduct is unlawful under the rule of reason or quick-look analysis.

138. Defendants have sufficient market and monopoly power over the relevant service markets to appreciably restrain free competition in these markets. In fact, they have that power as a matter of law. Defendants' exercise of that power did, in fact, significantly restrain one or more markets, which harmed competition in a way that was not otherwise correctable because of significant entry barriers.

40

139.   Defendants' conduct and agreements harm competition in the relevant markets by excluding Mr. Manookian from competing with them.

140.   Defendants' conduct and agreements have and will increase prices—including by decreasing settlement values—and decrease the quality and quantity of services in the relevant service markets.

141.   As a result of defendants' anticompetitive conduct, Mr. Manookian has and will continue to be injured through significant economic and financial loss, the loss of current and future business, reputational damage, and the inability or difficulty to obtain funds already earned. Thus, Mr. Manookian has suffered antitrust injury that flows from the defendants' harm to the market.

142.   Defendants' conduct and agreements were intended to and did substantially harm interstate commerce. Although the geographic market is local—plaintiff medical malpractice lawyers in Tennessee—defendants' anticompetitive conduct affects interstate commerce as many of the players affected by this market are national, or at least interstate, companies including hospitals and insurance companies. Health care markets themselves involve interstate commerce.

143.   Defendants' agreements and conduct do not qualify for state-action immunity, nor are they reasonably related to any efficiencies or other benefits sufficient to justify their harmful effects on competition in the relevant markets.

144.   The anticompetitive harm from defendants' conduct substantially outweighs any efficiency and competitive benefits.

41

145.   Plaintiff is entitled to recover treble damages under 15 U.S.C. § 15 and injunctive relief under 15 U.S.C. § 26.

## REQUEST FOR RELIEF

WHEREFORE, Mr. Manookian requests that this Court:

A.   Enter judgment against defendants;

B.   Declare that Tennessee Rule of Professional Conduct 9, § 12.3 is unconstitutional facially and as applied;

C.   Declare that defendants' conduct violates 15 U.S.C. § 1;

D.   Enjoin defendants from continuing their unlawful acts;

E.   Order defendants to dissolve Mr. Manookian's suspension;

F.   Award Mr. Manookian damages for violations of his constitutional rights, including, but not limited to, actual damages and punitive damages;

G.   Award Mr. Manookian trebled damages under 15 U.S.C. § 15.

H.   Award Mr. Manookian his costs and expenses of this action, including his reasonable attorneys' fees necessarily incurred in bringing and pressing this case, as provided in 15 U.S.C. §§ 15, 26 and 42 U.S.C. § 1988;

I.   Award Mr. Manookian pre- and post-judgment interest at the applicable rates on all amounts awarded; and

J.   Order any other such relief as the Court deems appropriate.

42

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims.

DATED: April 29, 2019               By:

/s/ Daniel Horwitz
_____

Daniel Horwitz
Tennessee Bar No. 032176
1803 Broadway, Suite #531
Nashville, TN 37203
(615) 739-2888
daniel.a.horwitz@gmail.com

*Local Pro Bono[1] Counsel for Plaintiff*

Jarod Bona (pending *phv*)
Aaron Gott (pending *phv*)
BONA LAW PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
(858) 964-4589
jarod.bona@bonalawpc.com
aaron.gott@bonalawpc.com

*Counsel for Plaintiff*

---

1.    Any attorney's fee awarded to Mr. Manookian and earned by Mr. Horwitz shall be donated to the First Amendment Center.