

RECEIVED

OCT 0 1 2018

Board of Professional
Responsibility

IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE

FILED

SEP 2 8 2018

Clerk of the Appellate Courts
Rec'd By _____

| | | |
|---|---|---|
| IN RE: BRIAN PHILLIP MANOOKIAN | ) | |
| BPR No. 026455, Respondent | ) | No. M2018-01711-SC-BAR-BP |
| An Attorney Licensed to Practice | ) | BOPR No. 2018-2914-5-WM-12.3 |
| Law in Tennessee | ) | |
| (Davidson County) | ) | |
| | ) | |

## VERIFIED PETITION FOR DISSOLUTION OR AMENDMENT OF ORDER OF TEMPORARY SUSPENSION

Respondent, Brian Phillip Manookian, through his attorneys, hereby petitions for dissolution or amendment of the order entered by this Court on September 21, 2018, temporarily suspending Respondent from the practice of law pursuant to Tenn. Sup. Ct. R. 9, § 12.3 (the "September 21 Suspension Order"). For the reasons asserted herein, and/or which will be addressed at a hearing relative to Respondent's Petition for Dissolution of, or alternatively for the amendment of, the September 21 Suspension Order ("Petitioner's Dissolution Petition"), Respondent respectfully submits that the September 21 Suspension Order was improvidently granted and was not warranted – procedurally or factually.

### I. The Board of Professional Responsibility's Petition for Temporary Suspension is Procedurally Defective.

It is a generally accepted principle of law that a state administrative agency is bound by and must follow its own regulations. *See In re Emmalee O.*, 464 S.W.3d 311, 322 (Tenn. Ct. App. 2015). Although such principle was only briefly addressed *In re Emmalee O*, the Tennessee Court of Appeals acknowledged and described such principle as the "Accardi Doctrine." *Id.* ("The Accardi Doctrine refers to a doctrine originating in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954) which relates to an agency's requirement to adhere to the rules and regulations to which it is bound."). The Tennessee Attorney

**EXHIBIT 3**

General's Office also recognized, and further expounded upon, the Accardi Doctrine in a 2010 formal opinion as follows:

> While we have found no reported Tennessee case directly on point, it is a generally accepted principle of law that a state administrative agency is bound by and must follow its own regulations, including procedural regulations, even when the adoption of these same regulations was within the agency's discretionary authority. See 2 Am. Jur. 2d *Administrative Law* § 241 (2009). No less than thirty-seven states as well as the District of Columbia have reported cases holding that a state agency is bound by its own rules. Moreover, more than half a century ago the United States Supreme Court held that all federal administrative agencies are required to follow their own rules, a principle universally recognized to date as the "Accardi doctrine." See *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954). This Office is unaware of any authority to the contrary. **In short, it is "axiomatic that an agency is bound by its own regulations."** *Panhandle Eastern Pipe Line Co. v. FERC*, **613 F.2d 1120, 1135 (D.C. Cir. 1979). To allow an administrative agency to violate its own rules and regulations with impunity would in practical effect render the rules meaningless.** Accordingly, this Office believes that a Tennessee court would hold that Tennessee boards and commissions are bound by and must follow their own rules and regulations.

*See* Op. Tenn. Atty. Gen. No. 10-09 (Jan. 26, 2010). Emphasis added.

As stated in the above formal opinion, most states have recognized the Accardi Doctrine. One of those states, Maryland, has stated through its appellate decisions:

> . . . Courts will not permit an agency to violate the plain language of its regulation.

> It is well established that rules and regulations promulgated by an administrative agency [such as the DOC] cannot be waived, suspended or disregarded in a particular case as long as such rules and regulations remain in force. This rule has been recognized in federal and state jurisdictions and has become known as the "Accardi doctrine" since it was announced in *U.S. ex rel Accardi v. Shaughnessy*, 347 U.S. 260, [74 S.Ct. 499, 98 L.Ed. 681] (1954).... This doctrine has been broadly applied.... "An agency of the government must scrupulously observe rules, regulations or procedures which it has established. When it fails to do so, its action cannot stand and courts will strike it down." ... [T]here is an abundance of authority for the doctrine that an agency cannot violate its own rules and regulations....

> *Hopkins v. Maryland Inmate Grievance Comm'n*, 40 Md. App. 329, 335–36, 391 A.2d 1213 (1978) (quoting *United States v. Heffner*, 420 F.2d 809, 811

2

(4th Cir.1970)) (other citations omitted). *See also* IV–13 *Administrative Law* § 13.03 (Matthew Bender 2000) ("Properly promulgated regulations have the force of law, binding the agency as well as other affected persons.... [C]ourts have not allowed agencies to violate any rules and regulations that were promulgated to benefit a party ... by entitling him to a substantive benefit").

*Smith v. State*, 780 A.2d 1199, 1205 (Md. Ct. Spec. App. 2001).

The Board of Professional Responsibility's ("BPR") Petition for Temporary Suspension (the "BPR's Petition") filed on September 19, 2018, which served as the sole basis for the issuance of the September 21 Suspension Order, is procedurally defective and should have been disregarded because the BPR's Petition does not comply with the procedural requirement that such petitions must be "**supported by an affidavit or declaration under penalty of perjury** demonstrating facts personally known to affiant showing that an attorney ... poses a threat of substantial harm to the public." Tenn. Sup. Ct. R. 9, § 12.3(a) (emphasis added).[1]

Not only does the lack of an affidavit or declaration violate Tenn. Sup. Ct. R. 9, § 12.3(a), but, lacking sworn support, the BPR's Petition instead relies primarily upon unsworn, contested information from judicial opinions and party pleadings, as evident from the allegations in Paragraphs 3, 4, 5, 7, 8, 9, and 10 of the BPR's Petition. Consequently, the BPR's Petition effectively seeks to take judicial notice of the allegations contained in those Paragraphs, but the allegations contained therein do not fall within the scope of matters capable of judicial notice.

The Tennessee Supreme Court addressed the general principles, and limitations, regarding the use of judicial notice in *State v. Lawson*, 291 S.W.3d 864 (Tenn. 2009):

---

[1] In addition to the procedural defects in the BPR's Petition, the Petition's transmittal letter is dated August 19, 2018, presumably in error, and is not signed personally by the attorney who ostensibly drafted the letter. Moreover, the transmittal letter initially copied Brian Faughnan, Esq., who until recently represented the Respondent with respect to certain matters already pending before the BPR before the BPR's Petition was filed. At the time the BPR's Petition was filed, the BPR was aware Mr. Faughnan was withdrawing from representing the Respondent, and, as a result, Mr. Faughnan's name is struck through on the transmittal letter, and the Respondent's name is handwritten above Mr. Faughnan's name.

3

Judicial notice is defined as an acceptance by a court, "for purposes of convenience and without requiring ... proof, of a well-known and indisputable fact." *Black's Law Dictionary* 863–64 (8th ed. 2004). Traditionally, Tennessee courts have taken judicial notice of certain facts "as a substitute for the production of evidence." *Metro. Gov't of Nashville & Davidson County v. Shacklett*, 554 S.W.2d 601, 605 (Tenn. 1977). The purpose of the doctrine is to save time and dispense with the necessity of the presentation of proof. *State ex rel. Schmittou v. City of Nashville*, 208 Tenn. 290, 345 S.W.2d 874, 883 (1961); *State v. Nunley*, 22 S.W.3d 282, 287 (Tenn. Crim. App. 1999). Resort to judicial notice is, however, subject to limitations, as indicated by Rule 201 of the Tennessee Rules of Evidence, effective January 1, 1990, which is virtually identical to its counterpart under the Federal Rules of Evidence.

\* \* \*

[T]hose matters pertaining to the records of a court are subject to judicial notice by the judge **of that court**. *See generally* Robert Banks, Jr. & Elizabeth T. Collins, *Judicial Notice in Tennessee*, 21 Mem. St. U. L. Rev. 431 (1991).

Judicial interpretations of the corresponding federal rule provide support for the proposition that "[i]f the records are **of the court itself**, they may be judicially noticed and need not be proved." 2A Charles A. Wright, *Federal Practice and Procedure: Criminal* § 441, at 254 (3d ed. 2000)... Further, the federal courts have approved the taking of judicial notice of filed documents so long as the purpose was "to establish the fact of such litigation and related filings," **rather than to establish the truth of the matters asserted in the other litigation.** *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992) (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991))... Other federal cases concur in the axiom that **if the proceedings are of a particular court,** that court may appropriately take judicial notice. *See, e.g., United States v. McCargo*, 783 F.2d 507, 509 (5th Cir.1986); *United States v. Crow Dog*, 532 F.2d 1182, 1188 n. 5 (8th Cir. 1976), *cert. denied*, 430 U.S. 929, 97 S.Ct. 1547, 51 L.Ed.2d 772 (1977).

*Lawson*, 291 S.W.3d at 868-70 (footnotes omitted) (emphasis added).

Pursuant to the above principles, it is inappropriate for the BPR's Petition to effectively take judicial notice of, and accept as true for purposes of seeking to suspend the Respondent's law license, the substance of pleadings filed in proceedings not pending before the BPR.

4

Because of the significant consequential procedural defects in the BPR's Petition, namely, the failure to submit the Petition with the required affidavit or declaration, the BPR's Petition should be withdrawn and the September 21 Suspension Order either be rescinded or certain deadlines imposed by the September 21 Suspension Order and/or Tenn. Sup. Ct. R. 9, § 28 be at least suspended or delayed until the Respondent has an opportunity to be heard with respect to Respondent's Petition.

II.     **The BPR is already addressing certain complaints referenced in the BPR's Petition and the Respondent is cooperating in the investigation of those complaints.**

Alternatively, and without waiving the Respondent's objection to the procedural defects in the BPR's Petition, even if the BPR's Petition was not procedurally defective, temporary suspension of the Respondent was, and is, not factually warranted. The alleged grounds asserted in the BPR's Petition do not sufficiently establish a preliminary finding that Respondent poses a "substantial threat of harm to the public" and/or the necessity of a temporary suspension of Respondent's license; particularly when the chronology, context and status of the alleged matters and complaints upon which the BPR relied in its Petition at the time of the filing are fully, and fairly, considered.

Certain of such BPR complaints have previously been addressed and dismissed by the BPR without any disciplinary measures assessed. With respect to the matters asserted in the BPR's Petition which are the subject of pending BPR complaints, those matters were being addressed in an agreed and/or orderly fashion without any implication that a temporary suspension of the Respondent's license was even indicated, much less emergently necessary, prior to the filing of the BPR's Petition.  The BPR's Petition does not explain what changed or caused the BPR to believe that a temporary suspension was suddenly necessary.

5

### III. The BPR's Petition fails to establish that the Respondent poses a threat of substantial harm to the public.

#### A. The standard of review.

Whether to affirm or dissolve the BPR's Petition should be analyzed under a similar standard of review that governs a court's determination of whether to issue a temporary injunction. A temporary injunction may issue under the Tennessee Rules of Civil Procedure

> if it is clearly shown by verified complaint, affidavit or other evidence that the movant's rights are being or will be violated by an adverse party and the movant will suffer immediate and irreparable injury, loss or damage pending a final judgment in the action, or that the acts or omissions of the adverse party will tend to render such final judgment ineffectual.

Tenn. R. Civ. P. 65.04(2).

Both Tennessee and federal courts analyze these four factors when determining whether a temporary injunction is warranted under Rule 65:

> (1) the threat of irreparable harm to [the movant] if the injunction is not granted; (2) the balance between this harm and the injury that granting the injunction would inflict on the [non-movant]; (3) the probability that [the movant] will succeed on the merits; and (4) the public interest.

*Gentry v. McCain*, 329 S.W.3d 786, 793 (Tenn. Ct. App. 2010) (quoting *South Cent. Tenn. R.R. Auth. v. Harakas*, 44 S.W.3d 912, 919 n.6 (Tenn. Ct. App. 2000)).

Certain jurisdictions, including Arkansas, Utah, and the District of Columbia, also use similar factors when analyzing the propriety of an attorney's temporary suspension from the practice of law:

> The Supreme Court of Utah, relying on the decision in *Malvin*, [466 A.2d 1220 (D.C. 1983)], adopted the following four-factor standard in analyzing the propriety of an attorney's interim suspension: (1) whether the public will suffer irreparable harm, unless the order of interim suspension issues; (2) whether the threatened injury to the public outweighs whatever damage the proposed order may cause the attorney temporarily suspended from the practice of law; (3) whether the proposed order, if issued, would be adverse to the public interest; and (4) whether there is a substantial likelihood, based on all available evidence, that a significant sanction

6

will be imposed on the attorney at the conclusion of any pending disciplinary proceedings.

*Tapp v. Ligon*, 428 S.W.3d 492, 497-98 (Ark. 2013); *see also In re Discipline of Trujillo*, 24 P.3d 972, 979 (Utah 2001).

Given the similarity between a temporary injunction under Rule 65 and a petition for the temporary suspension of an attorney's law license and given that other jurisdictions have recognized this similarity and use the Rule 65 factors when analyzing the propriety of temporarily suspending an attorney's law license, the BPR's Petition should also be examined under this standard.

### B. The Respondent poses no threat of immediate irreparable harm to the public.

"Injunctions are issued to prevent irreparable injury and the injury must be actually threatened or imminent." *State ex rel. Agee v. Chapman*, 922 S.W.2d 516, 519 (Tenn. Ct. App. 1995) (citing *State ex rel. Baird v. Wilson Cnty.*, 371 S.W.2d 434, 439 (Tenn. 1963)). The irreparable injury "must [also] be real and practically unavoidable and certain." *Id.* (citing *J.W. Kelly & Co. v. Conner*, 123 S.W. 622, 636 (Tenn. 1909)). Similarly, the District Court for the Eastern District of Tennessee has stated that a party "seeking a preliminary injunction must 'demonstrate that irreparable injury is *likely* in the absence of an injunction.'" *Thompson v. Hayes*, 748 F.Supp.2d 824, 832 (E.D. Tenn. 2010) (quoting *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008)) (emphasis in original). The Sixth Circuit Court of Appeals has also declared that irreparable harm "must be both certain and immediate, rather than speculative or theoretical." *Mich. Coal. Of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991). A preliminary injunction issued "based only on a possibility of irreparable harm is inconsistent with [the] characterization of injunctive relief as an extraordinary remedy that may only be

7

awarded upon a clear showing that the [movant] is entitled to such relief." *Thompson*, 748 F.Supp.2d at 832.

In the context of the temporary suspension of a law license, the Court of Appeals for the District of Columbia has likewise emphasized that there must be "a strong showing of 'great public harm'" before a temporary suspension is imposed, as "a temporary suspension is an extreme measure, reserved for exceptional cases." *In re Malvin*, 466 A.2d 1220, 1223 (D.C. 1983).

### i. The July 20, 2018 Memorandum and Order.

Respondent's conduct and/or alleged conduct referenced in the BPR's Petition fails to demonstrate that the Respondent poses a substantial threat of immediate irreparable harm to the public. Paragraph 3 of the BPR's Petition cites and relies upon certain conclusions of Michael W. Binkley, Judge of the 21st Judicial District Circuit Court ("Judge Binkley"), from his July 20, 2018 Memorandum and Order ("Judge Binkley's July 20, 2018 Order") concerning petitions for contempt and/or sanctions filed against the Respondent by "Non-Parties" in a suit filed in the Circuit Court for Williamson County, *Chase v. Stewart, et al.*, Docket No. 2015-200.[2]

As a threshold matter, and as reflected in the Respondent's correspondence with the BPR relative to the submission of Judge Binkley's July 20, 2018 Order to the BPR, Respondent disputes whether the involved evidence supports the findings/conclusions of Judge Binkley cited in the BPR's Petition, as well as other findings/conclusions reached by Judge Binkley.[3]

---

[2] As a part of Judge Binkley's July 20, 2018 Order, Judge Binkley stated that he would "… refer to the Board of Professional Responsibility the conduct of …" the Respondent. (see page 118 of Judge Binkley's July 20, 2018 Order). The BPR has assigned the referral of such order to the BPR as BOPR File No. 57892-5-SC.

[3] For example, see the correspondence between the BPR and Respondent dated August 3, 2018, attached as Exhibit 1 hereto. As of August 28, 2018, the BPR's representative stated that he would "notify the undersigned if an additional response is needed other than the obligation to keep you [Disciplinary Counsel Steven Christopher] apprised of the status of this pending matter." (See correspondence between Disciplinary Counsel Christopher and the undersigned dated August 28, 2018, attached as Exhibit 2 hereto).

The Respondent also filed on September 21, 2018 a "Third Motion for Recusal" of Judge Binkley because of certain statements and the conduct of Judge Binkley following the entry of the July 20, 2018 order including, but not limited to, Judge Binkley's *sua sponte* orders and his August 30, 2018 statements in the Clemmons Proceeding referenced and described in Respondents' Third Motion for Recusal, which Respondent submits are evidence that Judge Binkley's impartiality should be reasonably questioned, and that Judge Binkley has apparently relied upon extrajudicial information in assessing the Respondent and his alleged conduct. (For example, see the September 21, 2018 Third Motion for Refusal (pages 3 – 10) and the Declarations of the Respondent and Samuel Clemmons filed in support of such motion which will be supplied at the hearing on this Petition).[4]

In assessing whether the Respondent "poses a threat of substantial harm to the public" based upon the findings/conclusions of Judge Binkley in his July 20, 2018 Order, the complete

---

[4] For example, although Respondent's First and Second Recusal Motion had long since been addressed by Judge Binkley, and to a limited extent by the Court of Appeals, Judge Binkley nevertheless chose to assert in his July 20, 2018 Order certain of his opinions regarding the Respondent's bases for recusal in those motions as part of Judge Binkley's findings/conclusions stated in his July 20, 2018 Order. In that regard, on pages 59 – 60 of his July 20, 2018 Order, Judge Binkley continues to express his opinions concerning matter raised by the Respondent in support of the First Recusal Motion which appear to be based upon either Judge Binkley's personal investigations or extrajudicial information of Judge Binkley regarding an "anonymous" complaint to the Board of Professional Responsibility. Judge Binkley has continued to express such opinions about the Respondent in an August 30, 2018 hearing in an unrelated case, *Clemmons v. Nesmith*, a matter in which the Respondent is not a party or an attorney and was not present. (See Third Motion for Recusal of Judge Binkley, pp. 9 - 10). Judge Binkley's statements regarding the Respondent expressed during such August 30, 2018 hearing included the following:

> There is a lawyer, Mr. Brian Manookian, who I have release a one-hundred-twenty-two page memorandum and order on, who, among many, many other things, submitted a false and fake package, along with another person, to the Board of Professional Responsibility and the Court of the Judiciary.
>
> * * *
>
> And as a judge it's probably good that I don't say a word. It's very difficult. But my day will come. And it's just about here... I feel like it's necessary for me to be crystal clear, transparent and clear. I did not like what Mr. Manookian did at all, and my day will come.

(See Third Motion for Recusal of Judge Binkley, pp. 9 - 10).

evidentiary testimony of the Respondent[5] and other evidence concerning such matters[6] should be considered rather than improperly taking notice of the disputed findings/conclusions of Judge Binkley.

ii. *Shao v. HCA.*

In Paragraph 4 of the BPR's Petition, the BPR referenced the *Shao v. HCA* case. The BPR's Petition, however, does not disclose that after receiving the Respondent's response and explanation to the BPR complaint filed with respect to such matter (see BOPR File No. 52387-5-ES), this BPR complaint was dismissed on or about June 12, 2017. (See Respondent's May 22, 2017 Response, without exhibits, to BOPR File No. 52387-5-ES & File No. 52385-5-SC, attached hereto as Exhibit 3; BPR's June 12, 2017 letter to Respondent dismissing BOPR File No. 52387-5-ES, the contentions asserted in Paragraph 4 of the BPR's Petition, attached hereto as Exhibit 4). The BPR's Petition also does not reference what was contained in Respondent's response to the inquiry of the BPR concerning Judge Brothers' order. Specifically, Putnam County Circuit Court Judge Amy Hollars made the following statements in deciding another motion for default filed by Respondent in a similar case:

> I decline to find any improper behavior on the part of Plaintiffs' counsel. That does not mean that here in the Upper Cumberland we do not have a standard of civility. But after looking at this -- at the court file, I think that Plaintiffs' counsel have aggressively pursued and zealously pursued Plaintiffs' case, and that this filing of this motion was in part of that. I don't -- I don't criticize Plaintiffs' counsel for doing that.

Inexplicably, this dismissed complaint, which was resolved more than a year ago, now purports to demonstrate that Respondent poses a threat of *immediate* and irreparable harm to the public.

---

[5] See transcript of Respondent's testimony during the evidentiary hearing held on September 23, 2016, which will be supplied at the hearing on this Petition.
[6] For example, see March 17, 2016 Declaration of Respondent, which will be supplied at the hearing on this Petition.

### iii. The August 19, 2017 email to Attorney C.J. Gideon and *Diamond Consortium, Inc. v. David Blank v. Brian Manookian, et al.*

With respect to the unsworn allegations in Paragraph 5 of the BPR's Petition regarding an email sent by the Respondent on August 19, 2017 at 9:29 p.m. (the "August 19, 2017 Email"), and Paragraph 7 of the BPR's Petition regarding the *Diamond Consortium, Inc., and David Blank v. Brian Manookian, et al.* (the "Diamond Consortium Case"), these allegations are already the subject of pending petitions with the BPR. (*See* BOPR Docket No. 2017-2805-5-WM and BOPR Docket No. 2017-2809-5-WM, respectively). The Respondent has fully cooperated with the BPR's investigation concerning these matters, including scheduling discovery deadlines, depositions, and hearing dates; all of which were proceeding in an orderly, agreed-upon fashion.

The Respondent was until recently represented by Mr. Brian S. Faughnan, Esq. in connection with these complaints. On September 21, 2018 an Agreed Order was entered permitting Mr. Faughnan to withdraw from representing the Respondent concerning the complaint related to the Diamond Consortium Case, and on September 24, 2018 a substantially similar order was entered permitting Mr. Faughnan to withdraw from representing the Respondent concerning the complaint related to the August 19, 2017 Email (together, the "Agreed Orders"). (The Agreed Orders are attached hereto as Exhibits 5 and 6).

Notably, both Agreed Orders purport to give the Respondent sixty days to obtain new counsel, anticipate that a new scheduling order will be negotiated, and the September 24, 2018 Agreed Order continues a hearing in that matter related to the August 19, 2017 Email scheduled for October 16, 2018. (*See* Exhibits 5 and 6).

As evident from the Agreed Orders, the BPR was not handling these complaints on an expedited and/or emergency basis, at least not until it became known that Mr. Faughnan was

11

withdrawing from the case. On or about September 4, 2018, Mr. Faughnan emailed counsel for the BPR a draft motion to withdraw. Shortly thereafter, and before either Agreed Order was even entered, the BPR's Petition was filed on September 19, 2018.[7]

In Respondent's communications and dealings with the BPR regarding the August 19, 2017 Email and the Diamond Consortium Case, or in any of the other pending complaints filed with the BPR, there have been no discussions, or even indications, that the BPR believed that the conduct alleged in such complaints posed a threat of substantial harm to the public prior to the filing of the BPR's Petition. Additionally, the BPR's Petition does not explain what changed or caused the BPR to believe that a temporary suspension was suddenly necessary in part because of the August 29, 2017 Email or the Diamond Consortium Case.

### iv.    The August 4, 2018 email to attorney Phillip North.

The email referenced in Paragraphs 6 and 11 of the BPR's Petition and attached as Exhibit 4 to the BPR's Petition is only one in a series of email exchanges between the Respondent and Mr. Phillip North ("Mr. North"). Mr. North and his firm have contended on multiple occasions that they have unable to communicate with Mr. Manookian and his firm via email and fax. The purpose of the Respondent's email was to confirm that a specific email had been received and repeatedly opened at a residential property which the Respondent knew (through his friendship with Mr. North's daughters and through his investigation of public records) was Mr. North's home.

The Respondent also wanted Mr. North to confirm the voice of his brother, retired Judge Steve North ("Judge North"), who had contacted the Respondent to discuss Judge Brothers' conduct in the *Shao* matter, a recording of which was attached to the email. Although the Respondent detailed in a zealous manner why he believed that Mr. North had received and read

---

[7] This presumes the file date was September 19, 2018, as the transmittal letter for the BPR's Petition states it was sent for filing to the Supreme Court on August 19, 2018.

12

the Respondent's email and listened to the attached recording from a person claiming to be Judge North, the BPR's characterization of the incomplete email exchange with Mr. North as posing "a threat of substantial harm" is unfair, inaccurate, and devoid of context.

Further, the BPR was aware of the August 4, 2018 email prior to the filing of the BPR's Petition on September 19, 2018. (*See* BOPR File No. 58076-5-SC). In communicating with the BPR about such complaint, there had been no indication that the BPR believed that the email was evidence that the Respondent posed a threat of substantial harm to Mr. North or the public until the filing of the BPR's petition on September 19, 2018. Rather, the BPR voluntarily agreed in writing to provide the Respondent until September 21, 2018 to even provide a response to the BPR's inquiry regarding the email. (*See* September 5, 2018 email from the BPR to the Respondent, attached hereto as Exhibit 7).

Neither has Mr. North conducted himself in a manner even suggesting that he considered the August 4, 2018 email to be a threat. After receiving the email, Mr. North has voluntarily appeared at numerous hearings and depositions at which he knew in advance the Respondent would attend. On August 7, 2018, three days after receiving the supposedly threatening email, Mr. North showed up to a deposition Mr. Manookian was defending where Mr. North was neither a party nor an attorney, but simply because he wanted to observe the Respondent's law partner being deposed. (*See* August 7, 2018 email from the Respondent to Mr. North, attached hereto as Exhibit 8).

Mr. North attended those depositions without voicing any concern about his personal safety. Moreover, there is no claim that Respondent's conduct before, during and after those depositions was threatening, because it was not.

13

Paragraph 11 paraphrases the incomplete email exchange with Mr. North addressed in Paragraph 6 of the BPR's Petition out of context and does not even consider the request for confirmation of voice on the attached recording or the content of the attached recording. The paraphrase is an attempt to characterize the email as "a threat of substantial harm" when there is no such threat in the email. Moreover, in Respondent's communications and dealings with the BPR regarding Mr. North's complaint, or in any of the other pending complaints filed with the BPR, there have been no discussions, or even indications, that the BPR believed that the conduct alleged in such complaints posed a threat of substantial harm to the public prior to the filing of the BPR's Petition.

### vi.     Incidents from 2013, 2012, and 2004.

The statements made in Paragraphs 8 – 10 of the BPR's Petition to justify *ex parte* extraordinary and immediate relief reference matters which are not recent, relevant, or admissible. The BPR's Petition does not sufficiently explain what prompted the BPR to consider matters which occurred between 2004 and 2016. Apparently, the BPR is suggesting that the Respondent is a threat of harm to the public because he may cause physical harm to someone.

The 2004 matter referenced in Paragraph 10 of the BPR's Petition, the incident involved an altercation with a fellow fraternity member, David Binkley ("David") while Respondent was a college student and before he was licensed to practice law. Mr. Binkley and Mr. Manookian reconciled many years ago. Mr. Binkley has since served as the Respondent's real estate agent and referred multiple clients to Mr. Manookian. Mr. Manookian has also represented Mr. Binkley as his attorney in at least one matter.

Concerning the allegation in Paragraph 9 of the BPR's Petition regarding the statement in the 2014 divorce decree, Mr. Manookian disputes that any such conduct occurred by him and the

14

charges filed against the Respondent relative to these false allegations were dismissed and expunged. (*See* the December 6, 2011 Order for the Expungement of Criminal Offender Record attached hereto as Exhibit 9).

The Verified Complaint for Expulsion from Limited Liability Company filed in 2013 and the Order filed in 2016 which are addressed in Paragraph 8 of the BPR's Petition do not suggest that Manookian has violated any order restraining his conduct. It demonstrates that since 2013, Mr. Gary Semanchik has not made any further complaints about the Respondent and the Respondent did not even appear in response to Mr. Semanchik's Motion to Supplement Final Order. All of which demonstrates that Respondent complies with court orders and does not constitute a threat of substantial harm to the public.[8] Moreover, the BPR has previously opined that "much of the alleged conduct, if proven to be true, would not constitute a violation of the Rules of Professional Conduct." (*See* October 27, 2017 letter from the BPR, attached hereto as Exhibit 10).

The alleged grounds asserted in the BPR's Petition do not sufficiently establish a preliminary finding that Respondent poses a "substantial threat of harm to the public" and/or the necessity of a temporary suspension of Respondent's license particularly when the chronology, context and status of the alleged matters and complaints to the BPR relied upon by the BPR's Petition at the time of the filing of the BPR's Petition are fully, and fairly, considered. Certain of such BPR complaints have previously been addressed and dismissed by the BPR without any disciplinary measures assessed. With respect to the matters asserted in the BPR's Petition which are the subject of pending BPR complaints, those matters were being addressed in an agreed and/or orderly fashion without any implication that a temporary suspension of the Respondent's license

---

[8] This incident is also an example of how to address a concern if there is a fear for personal safety, that is, obtain an injunction enjoining the person from coming around or about the concerned person.

was even indicated, much less necessary prior to the filing of the BPR's Petition. Considering such circumstances and the length of time that the BPR has been aware of such complaints, what is unexplained in the BPR's Petition is what changed or caused the BPR to believe that a temporary suspension was suddenly necessary.

### C. The immediate and substantial harm to the Respondent outweighs the, at best, speculative harm to the public articulated by the BPR.

As recognized by the *Malvin* Court, temporarily suspending an attorney's law license is "an extreme measure" that should not be granted "in a routine disciplinary case." *In re Malvin*, 466 A.2d 1220, 1223 (D.C. Ct. App. 1983). It cannot be disputed that depriving the Respondent of his law license, even temporarily, is anything other than a severe sanction that immediately disrupts his clients' lives and may jeopardize the clients' cases which are presently pending. The vast majority of these clients are represented on a contingency basis and do not have the financial or legal capability to pursue their cases on their own.

This suspension also threatens the Respondent's livelihood and threatens to erode the Respondent's reputation well into the future long after this proceeding is concluded. The harm to Respondent's clients, Respondent's employees, and to Respondent is severe and immediate, whereas the alleged harm to the public vaguely articulated in the BPR's Petition is speculative and protects no specific, identifiable person or class of persons. Indeed, none of the Respondent's conduct and/or alleged conduct involves any of the Respondent's clients or, by extension, any member of the public that could foreseeably become the Respondent's client. **As such, there is no nexus between the Respondent's conduct and/or his alleged conduct as described in the BPR's Petition and the allegation that he poses a substantial threat of immediate irreparable harm to the public through the practice of law.**

16

Additionally, "[a] professional license, issued by a State, which can be suspended or revoked only upon a showing of cause is a constitutionally protectable property interest because the holder of the license has a clear expectation that he or she will be able to continue to hold the license absent proof of culpable conduct." *Martin v. Sizemore*, 78 S.W.3d 249, 262-63 (Tenn. Ct. App. 2001) (citing *Barry v. Barchi*, 443 U.S. 55, 64 & n.11 (1979)). Procedural due process protections "apply to administrative proceedings." *Id.* at 263 (citing *Richardson v. Tenn. Bd. Of Dentistry*, 913 S.W.2d 446, 455 (Tenn. 1995)).

"The extent and nature of the required procedural due process protections depends on the nature and circumstances of the case." *Id.* (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1976)). The factors typically considered by courts when determining "what procedural protections a particular circumstance requires" include:

> (1) the nature of the private interest affected by the official action, (2) the risk of erroneous deprivation of that interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards, and (3) the government's interests, including the function involved and the fiscal and administrative burdens that any additional or substitute safeguard would entail.

*Id.* (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

Courts also consider "the length and finality of the deprivation" of the property interest "and the availability of later appeals." *Id.* at 263-64.

While "[p]rocedural due process does not require perfect, error-free governmental decision-making," it does require affording the Respondent "a relatively level playing field in a contested case hearing," and the state is not "permitted to maintain such an unfair strategic advantage that a pall is cast over the fairness of the proceeding." *Id.* at 264.

In addition to the loss of livelihood and reputation, the Respondent has been, and will continue to be, harmed by the lack of meaningful procedural due process afforded him under the

17

procedure for temporary suspension. The Tennessee Supreme Court's rules authorized it to temporarily suspend the Respondent's license without providing the Respondent notice or an opportunity to be heard concerning the BPR's Petition. Tenn. Sup. Ct. R. 9, § 12.3. However, such a Petition must be supported by sworn testimony in the form of declarations or affidavits. The BPR's Petition is based on nothing more than the conclusory allegation that the Respondent poses a threat of substantial harm to the public in the practice of law – without a single affidavit or declaration testifying to the same. Tenn. Sup. Ct. R. 9, § 12.3.

Once the Respondent's license was suspended under Rule 9, § 12.3 without notice or an opportunity to be heard, the BPR was required to "provide notice of the . . . temporary suspension . . . to all State judges and to the Tennessee Bar Association." Tenn. Sup. Ct. R. 9, §28.11. The BPR was also required to cause the notice "to be published in a newspaper of general circulation in each county in which the respondent attorney maintained an office for the practice of law, and to be published in such other publications as the Board may determine to be appropriate." *Id.*

The damage to the Respondent was, therefore, immediate. Before having an opportunity to rebut any of the *unsworn* allegations in the BPR's Petition, the Respondent was stripped of his license and widely declared a threat to the public in multiple news media outlets undoubtedly seen by colleagues, clients, and potential clients. In addition to the BPR's press release and notification to the Tennessee Bar Association, an article concerning the Respondent's temporary suspension has appeared in The Tennessean and the Respondent has received at least one media inquiry asking for comment on the suspension.

Not only has the Respondent been widely declared a threat to the public, but the Respondent must participate in disseminating damaging and incorrect information about himself based on unsworn allegations:

18

By no later than ten days after the effective date of the order, the respondent attorney shall notify or cause to be notified by registered or certified mail, return receipt requested:

(a) all clients being represented in pending matters;

(b) all co-counsel in pending matters; and

(c) all opposing counsel in pending matters, or in the absence of opposing counsel, the adverse parties.

Tenn. Sup. Ct. R. 9, § 28.2.

Tenn. Sup. Ct. R. 9, § 12.3 does eventually provide the Respondent with an opportunity to be heard concerning the allegations in the BPR's Petition by permitting the Respondent to request that his temporary suspension be dissolved or amended. Tenn. Sup. Ct. R. 9, § 12.3(d). However, by the time the Respondent was able to retain counsel to represent him in connection with the BPR's Petition, and by the time the Respondent and his counsel were able to prepare the instant Petition seeking dissolution or amendment of the BPR's Petition, the Respondent had already been damaged by the taking of his license and the BPR's immediate dissemination of unsworn, damaging, and incorrect information about the Respondent. Moreover, despite filing this Petition prior to the expiration of the Respondent's notification deadlines in Tenn. Sup. Ct. R. 9, § 28.11, those deadlines will likely arrive before this Petition can be heard and decided, which will force the Respondent to further perpetuate the damage from the unconstitutional taking of his law license.

Accordingly, the Respondent has already suffered and will continue to suffer greater harm than the harm the BPR's Petition alleges the public will suffer if the Respondent retains his license.

**D.     The BPR's Petition does not demonstrate a strong likelihood of success.**

A party seeking a temporary injunction must demonstrate "a strong likelihood of success on the merits" to justify the issuance of a temporary injunction. *Moncier v. Jones*, 803 F.Supp.2d

815, 826 (E.D. Tenn. 2011); *see also Taylor v. City of Knoxville*, 566 F.Supp. 925, 929 (E.D. Tenn. 1982) (stating that a plaintiff must show "a strong or substantial likelihood or probability of success on the merits" to justify the issuance of preliminary injunction). Similarly, when a disciplinary body considers whether to temporarily suspend an attorney's law license, there must be a "substantial likelihood" that the disciplinary body will impose "a significant sanction" at the conclusion of the disciplinary proceeding. *Tapp*, 428 S.W.3d at 498. "A stronger likelihood of success on the merits is required if the other factors militate against granting relief." *Moncier*, 803 F.Supp.2d at 826. Given the severe ramifications of suspending a law license (i.e., the temporary loss of livelihood and perhaps permanent damage to reputation), this burden of proof is justified.

In this case, the BPR has already considered and dismissed the complaint related to the Respondent's filing of a motion for default judgment in the *Shao v. HCA* case without disciplining the Respondent. (*See* Exhibit 4).

The complaints concerning the August 19, 2017 Email to C.J. Gideon and the Diamond Consortium Case are pending, but the Respondent respectfully submits that if he is disciplined in connection with either complaint, any further suspension of his law license is unlikely.

The complaint concerning Judge Binkley's July 20, 2018 Memorandum and Order is in its infancy, with only Judge Binkley's opinion concerning the matter currently before the BPR. Judge Binkley's bias against the Respondent is described in the Respondent's Third Motion for Recusal filed in the *Chase v. Stewart* matter. The Respondent respectfully submits that Judge Binkley has based his July 20, 2018 Memorandum Opinion and Order on incorrect information concerning the Respondent. Additionally, in the event the Third Motion for Recusal and/or the July 20, 2018 Memorandum and Order are ultimately resolved in the Respondent's favor, discipline against the Respondent would be unnecessary. In other words, as the issue of sanctions in *Chase v. Stewart*

20

is currently active and may ultimately resolve in the Respondent's favor, it would be premature to opine that there is a substantial likelihood that the Respondent will receive a serious sanction because of his conduct in that case.

Concerning the August 4, 2017 email to Mr. North, the Respondent submits that when this email is read in its proper context, including that the Respondent is friends with the individuals he is alleged to have threatened in this email, any discipline would be unwarranted.

In regard to the Respondent's physical altercation in 2004 with his now-client, David Binkley, the BPR was aware of this incident before the Respondent was granted a law license. Since receiving his license, the Respondent has not been disciplined for this event, which occurred approximately 14 years ago while the Respondent was an undergraduate.

The false allegations of assault from the Respondent's ex-wife have been both dismissed and expunged. (*See* Exhibit 9).

Finally, the BPR has opined as follows concerning the allegations relative to the Verified Complaint filed to expel the Respondent from Nashville Armory, LLC: "The Complainant included a pleading from the Davidson County Chancery Court case styled as <u>Gary Semanchik and Nashville Armory, LLC v. Brian Manookian</u>. Based upon review of the file, much of the alleged conduct, if proven to be true, would not constitute a violation of the Rules of Professional Conduct." (*See* Exhibit 10).

Accordingly, while there are presently certain active complaints against the Respondent with the BPR, it is not substantially likely that the Respondent will be sanctioned more severely than the present temporary suspension of his law license.

21

### E.     The public interest will not be served by temporarily suspending the Respondent's law license.

Finally, a court must consider whether the public interest will be served by granting a temporary injunction or, in this case, temporarily suspending an attorney's law license. Examples of attorneys whose suspensions served the public interest are found in the *Tapp*, *Malvin*, and *Trujillo* cases cited herein, as those attorneys, in contrast to the Respondent, were all accused of ethical violations involving direct and substantial harm to clients, and, by extension, any member of the public who might seek legal services from those attorneys. For example, in *Tapp*, the attorney attempted to place certain business associates into a Chapter 13 bankruptcy without their knowledge to avoid the foreclosure on certain real estate the attorney owned jointly with those individuals. *Tapp*, 428 S.W.3d at 494-95. Additionally, the attorney failed to maintain certain funds in his trust account on behalf of another client. *Id.* at 495.

In *Malvin*, the attorney was paid to represent a client in a divorce proceeding, but the attorney never filed a complaint and lied to his client when asked if the complaint had been filed. *In re Malvin*, 466 A.2d at 1221. The attorney failed to return calls and letters and never refunded the fee. *Id.* In another case, the attorney accepted a fee to file a "petition for a conservatorship for [the client's] brother," but the attorney delayed in filing the petition, did not inform his client when the petition was ultimately filed, failed to set a hearing date on the petition, and did not return his client's phone calls. *Id.* In another case, the attorney accepted a fee but failed to appear at an administrative evidentiary hearing, and later failed to appeal the government agency's decision, which was adverse to the client, despite agreeing to appeal the decision. *Id.* In a fourth disciplinary case against the attorney, he collected $2,250 in rent on behalf of his client, but failed to give the money to his client. *Id.* at 1222. When confronted, the attorney paid his client $1,000 but never paid the remainder. *Id.* In yet another case, the attorney accepted $5,225 from a client to make

22

payments into the registry of a court pursuant to a court order in a landlord-tenant case. *Id.* When a check from the attorney to the court clerk bounced, a default judgment was entered against the client, who was also evicted. *Id.*

In *Trujillo*, the attorney attempted to pay for an ethics seminar hosted by the Utah State Bar's Office of Professional Conduct (the "OPC") with a check drawn on his client trust account. *Trujillo*, 24 P.3d 973. The attorney subsequently ignored multiple requests for information from the OPC concerning the incident, but finally admitted that he had been commingling business funds with trust funds in the client trust account since his business account had been closed due to an IRS levy. *Id.* In another case, the attorney stole his client's money. Specifically, the attorney was given money to post bail for his client's boyfriend. *Id.* at 974. Ultimately, when the criminal case was dismissed, most of the bail money was refunded, but the attorney fabricated a reason for retaining the money and gave none of it to his client. *Id.* Finally, in the last case, the attorney accepted money to represent a client in criminal matter but failed to communicate in the two weeks leading up to a hearing in the case. *Id.* at 975. When the client fired the attorney and demanded the fee back, the attorney stated he would return the money, but never did so. *Id.*

In sum, the attorneys in the *Tapp, Malvin,* and *Trujillo* cases were all accused of ethical violations involving direct and substantial harm to their clients and, by extension, to potentially any member of the public who might seek legal services from those attorneys. In other words, their conduct demonstrated that they were a potential threat to anyone they happened to interact with professionally. These attorneys were taking money from clients without providing legal services, were attempting to use client funds for personal reasons, and were otherwise failing to diligently communicate with and represent their clients.

23

In contrast, the BPR's Petition does not allege that the Respondent's alleged conduct has harmed one or more of his clients, and, by extension, could harm any member of the public that could foreseeably become the Respondent's client. In fact, the BPR's Petition relies in part on a physical altercation between the Respondent and David Binkley in 2004 as an example of the threat that the Respondent poses to the public. As discussed herein, since the incident in 2004, which occurred before the Supreme Court issued the Respondent his law license and was disclosed by the Respondent when he applied for admission to the Tennessee bar, Mr. Binkley has become a client of the Respondent's.

The public undoubtedly has an overarching interest in attorneys, and all professionals, adhering to the rules that regulate their profession, but there is no particularized person or group of people that are specifically at risk of being harmed by the Respondent if he is permitted to continue practicing law. Indeed, a specific person one might expect, after reviewing the BPR's Petition, to feel threatened by the Respondent's conduct, Mr. North, has voluntarily appeared at numerous depositions at which he knew in advance the Respondent would attend. Despite such foreknowledge, Mr. North attended those depositions without voicing any concern about his personal safety.

Accordingly, the public interest has not been served by temporarily suspending the Respondent's license.

Respectfully submitted,

GRANT, KONVALINKA & HARRISON, P.C.

By: _____
John P. Konvalinka (BPR #001780)
*Attorneys for the Respondent*
633 Chestnut Street, Suite 900
Chattanooga, TN 37450
(423) 756-8400
(4230 756-6518 (*facsimile*)

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this Petition has been mailed first class, emailed, faxed, and/or hand delivered to the following:

William C. Moody
10 Cadillac Drive, Suite 220
Brentwood, TN 37027

This 28th day of September, 2018.

_____

Case 3:19-cv-00350   Document 24-3   Filed 06/11/19   Page 25 of 26 PageID #: 199

## OATH

STATE OF TENNESSEE   )
COUNTY OF DAVIDSON  )

     Personally appeared before me this 28TH day of SEPTEMBER_____, 2018, Brian Manookian, and whom being first duly sworn, acknowledges and affirms that he has read the foregoing Verified Petition for Dissolution or Amendment of Order of Temporary Suspension and the facts set forth therein are true and correct and based upon his personal knowledge, information, and belief.

_____
Brian Manookian

Sworn to and subscribed before me this 28TH day of SEPTEMBER, 2018.

_____
NOTARY PUBLIC

My commission expires: 08/20/2019

J DOUGLAS RICE
STATE OF TENNESSEE NOTARY PUBLIC
DAVIDSON COUNTY
My Commission Expires 08-20-2019

26