FILED
Feb. 14 2020
BOARD OF PROFESSIONAL RESPONSIBILITY
OF THE
SUPREME COURT OF TENNESSEE
Executive Secretary

Rec'd 2/17/20

# IN DISCIPLINARY DISTRICT V
## OF THE BOARD OF PROFESSIONAL RESPONSIBILITY
### OF THE SUPREME COURT OF TENNESSEE

IN RE:  **BRIAN PHILIP MANOOKIAN**
**BPR# 26455, Petitioner,**
**An Attorney Licensed to**
**Practice Law in Tennessee**
**(Davidson County)**

**DOCKET NO.**
**2017-2805-5-WM**

---

## RESPONDENT'S PRETRIAL BRIEF

---

### I.  INTRODUCTION

The Board of Professional Responsibility ("the Board") pursues two sets of allegations against Mr. Manookian.   The first set arises from Respondent's participation in the *Chase v. Stewart* matter.   The second set concerns the Board's attempts to regulate and punish Mr. Manookian's truthful, out-of-court speech.

The Board's allegations regarding the *Chase* matter are factually unfounded. The Board is simply wrong about what took place.   As a result, the Board has refused to respond to discovery related to the *Chase* allegations, and it will be unable to carry its burden of proof at trial.

The Board's attempts to punish Mr. Manookian over the truthful content of his out-of-court speech are legally unfounded.   The United States and Tennessee Supreme Courts have repeatedly and consistently held that the First Amendment

1

does not permit Rules of Professional Conduct to be weaponized in order to regulate and retaliate against protected speech that the Board finds objectionable. But that is precisely what the Board attempts here. For all of the reasons below, all of the Counts of the Petition, Supplemental Petition, and Second Supplemental Petition that have not already been dismissed should be rejected by this Hearing Panel.

## II.  THE CHASE COMPLAINT

### A. Facts and Background

*Chase v. Stewart* was a malicious prosecution case brought by real estate developer David Chase. Mr. Chase was arrested during the early morning hours of June 8, 2014 for domestic violence after beating his live-in girlfriend, Lauren Bull. Upon being booked into the Davidson County jail, Mr. Chase contacted attorney Bryan Lewis, who in turn called General Sessions Judge Casey Moreland, who arranged for Mr. Chase to be released from jail – notwithstanding a mandatory hold period – at which time Mr. Chase returned to his home and assaulted Lauren Bull a second time, leading to his immediate re-arrest, national headlines, and, ultimately this lawsuit.

Following the dismissal of criminal charges, David Chase filed a civil suit in Williamson County contending that various individuals had conspired to have him arrested for the purpose of ruining his reputation and depriving him of his burgeoning career in real estate development.

2

Brian Manookian agreed to represent six (6) of the eight (8) defendants in Mr. Chase's lawsuit, and moreover, to do so on a *pro bono* basis. As part of his representation, Mr. Manookian set out to prove that the dismissal of the criminal charges against Mr. Chase were not on the merits, but rather secured as part of a release-dismissal agreement with the Davidson County District Attorney. Doing so would defeat a central element of a malicious prosecution claim, in that the underlying charge must be dismissed on the merits as opposed to resulting from a negotiated settlement. Mr. Manookian additionally sought to prove that David Chase's claims of reputational harm were without merit.

### 1. The Proposed Agreed Limited Protective Order

On July 20, 2015, Mr. Manookian issued subpoenas to David Chase's parents, employer, and business entities: Dean Chase, Sandra Chase, D.F. Chase, Inc., CK Global LLC, and NV Music Row LLC (hereinafter the "Non-parties"). The subpoenas were targeted toward information tending to disprove David Chase's claims of reputational harm and malicious prosecution. They were made up of between thirty-five (35) and forty (40) categories of requests for documents and things. The subpoenas commanded the non-parties to produce the discovery materials by August 17, 2015, which was later extended to August 31, 2015.

Three days before the production was due, on August 31, 2015, the Non-parties filed a Motion for Entry of Agreed Limited Protective Order. The Motion

3

attached as Exhibit 1 an Agreed Limited Protective Order (hereinafter "ALPO") that was signed as approved for entry by or on behalf of all counsel of record at the time.

The proposed ALPO was narrowly tailored and limited in scope. It specifically defined the "confidential information" that was to be covered by its terms, and it repeatedly and expressly prohibited mass-designation of materials as "confidential."

§1 – Purpose and Limitations: … This Order does not confer blanket protections on all disclosures or responses to discovery, and the protection it affords extends only to the limited information or items provided by the Subpoenaed Parties that are entitled, under applicable legal principles, to treatment as confidential.

§2 – Confidential Information: Confidential information shall mean Social Security numbers; dates of birth; names of minor children; financial account numbers; home addresses; sensitive information regarding personal financial, medical, matrimonial, or family matters; or trade secrets and other confidential research, development, or commercial information… that would significantly undercut a legitimate competitive advantage of the Designating Party… if disclosed.

§5.1 – Exercise of Restraint and Care in Designating Materials for Protection: Each Party or Non-party that designates information or items for protection under this Order must use good faith efforts to limit any such designation to specific material that qualifies under the appropriate standards. A Designating Party must use good faith efforts to designate for protection only those parts of material, documents, items, or oral or written communications that qualify — so that other portions of the material, documents, items, or communications for which protection is not warranted are not swept unjustifiably within the

4

ambit of this Order. **Mass, indiscriminate, or routine designations are strictly prohibited.**[1]

### 2. Immediate Violation of the ALPO by the Non-Parties

Prior to entry of the ALPO – and on the very same day the Non-parties submitted the ALPO to the Court for review and approval – they made a production of over 79,000 pages of documents, every single page of which they had self and mass-designated as "Confidential". Counsel for the non-parties later admitted to the Court that they did not even review the documents included in the mass-designated production. Rather, and in violation of the Proposed Order the non-parties themselves had submitted to the Court, the non-parties stated, "after evaluating the enormous amount of time and cost inherent to conducting a page-by-page review of the ESI, the Designating Parties chose the less-burdensome approach of designating all ESI as confidential." Thus, from the outset, the non-parties determined that were not bound by the ALPO – at least not until it had been reviewed, approved, and entered by the Trial Court.

### 3. The Failure to Designate Non-Parties' Testimony as Confidential

Non-parties Dean and Sandra Chase were deposed on September 16, 2015. According to the terms of the unentered, unapproved ALPO, if either deponent

---

[1] Emphasis in original.

wished to designate any portion of their testimony as confidential, they were required to make those designations "on the record, before the close of the deposition" or, if impracticable, to do so "within 10 days of the deposition." On that point, the ALPO specifically stated that:

> Only those portions of the testimony that are appropriately designated for protection within the 10 days shall be covered by this Stipulated Order. Transcript pages containing Protected Material must be identified by the court reporter, who must affix to the bottom of each such page the legend "CONFIDENTIAL," as instructed by the Party or nonparty offering or sponsoring the witness or presenting the testimony.

Thus, the last date for designating the testimony of Dean or Sandra Chase as confidential was September 26, 2015. It is undisputed that neither Dean Chase, Sandra Chase, nor their counsel designated any portion of their testimony as "confidential" within ten (10) days of their deposition, or in conformity with the unentered, Proposed ALPO.[2] As a result, the transcripts were not marked confidential by the Court Reporter and received no protection, even under the terms of as-yet unentered and merely Proposed ALPO.

### 4. No Limitation on Use and Dissemination of Discovery Materials

Thus, up to and through October 30, 2015: (1) no court had ordered that any discovery material produced by the Non-parties was in any way confidential or not

---

[2] R. at 4688 (183:8-21).

to be disseminated; (2) the Non-parties had already violated the fundamental terms of their own Proposed ALPO by improperly mass and self-designating every page of their 79,000 page production as "Confidential," and; (3) the Non-parties failed to designate the deposition testimony of Dean and Sandra Chase as "confidential" even by the terms of their own non-binding and only Proposed Order that they had previously submitted to the Court.

### 5. *Disclosure of Discovery Materials to the Media and Federal Authorities*

Between October 4 and 6, 2015, Mr. Manookian provided deposition testimony from Dean and Sandra Chase's depositions as well as certain text messages produced in discovery to Jeremy Finley, Phil Williams, and Jim Ridley of media outlets, WSMV, WTVF, and the Nashville Scene, respectively (hereinafter "the Media Outlets"). Believing those same materials may have triggered a professional duty to report a crime, and upon the advice of his own counsel, Mr. Manookian provided the same materials to the U.S. Attorney's Office and the Federal Bureau of Investigation during an in-person meeting on October 8, 2015.

On October 30, 2015, the Trial Court, in an oral ruling at the request of the non-parties, entered its first order of any kind limiting the dissemination or use of any of the discovery materials Mr. Manookian had previously disclosed to the media and Federal authorities. The Trial Court first memorialized that ruling in the form of a written order dated November 6, 2015 – months after (1) the submission of the

7

ALPO by the Non-parties and (2) the total disregard of the terms of the ALPO by the Non-parties in the interim.

On February 3, 2016, the Media Outlets published a series of stories centered around the existence of a secret release-dismissal agreement between David Chase and the Davidson County District Attorney regarding the domestic violence charges at the center of this civil action. The discovery materials that Mr. Manookian provided to the Media Outlets between October 4 and 6, 2015 featured prominently in the public reporting.

On February 23, 2016, the non-parties filed a Motion again asking the Trial Court to "enter the Agreed Limited Protective Order." The Motion was heard on March 10, 2016. During that hearing the Trial Court acknowledged that it had never signed or entered the ALPO and questioned whether it could hold anyone in contempt of an order it had not entered.

> THE COURT: Now, the agreed limited protective order as to certain subpoenaed nonparties, which was signed, apparently, by all of counsel at that time, was not signed by the Court. The one that was signed is the order as a result of the hearing.
>
> ...
>
> And the issue there, the question there is: Since there was a hearing that went forward with further information about what was requested to be under the protective order, this order, the one I signed – and that, again,

8

is November 6, 2015 – is the only order, at least for this date at this time, that has been signed that sets forth protected information.[3]

…

THE COURT: The next question on that same order, which is not signed by the Court, what is the legal effect of that order with regard to enforcement, for example, on contempt?[4]

On April 11, 2016, Dean Chase, Sandra Chase, and D.F. Chase, Inc., filed a Petition for Contempt and Sanctions against Appellants arising out of Mr. Manookian's disclosure of the discovery materials to the media outlets.[5]  On July 20, 2018, the Trial Court held that Mr. Manookian's disclosure to the media of the discovery materials constituted contempt of its orders and sanctioned Appellants $745,769.21 for the same, leading to an appeal that is currently pending.

6. *The King v. Chase Lawsuit*

On January 12, 2016, Jonathan King – a partner in a real estate venture with Dean Chase – initiated a "books and records" lawsuit against Dean Chase in the Davidson County Chancery Court.  Brian Manookian served as counsel for Mr. King.  In pursuing that action, Brian Manookian relied upon and attached as an exhibit to pleadings the Partnership Agreement of NV Partners; a document to which

---

[3] R. at 3515 (emphasis added).
[4] R. at 3532-3533 (emphasis added).
[5] R. at 2378.

9

Jonathan King was a signatory and party. The Partnership Agreement had been previously produced within the 79,000 page document dump in the present action.

Dean Chase responded by taking the position that use of the Partnership Agreement in the *King v. Chase* action constituted a violation of the Protective Order in the *Chase v. Stewart* action, notwithstanding the fact that Jonathan King – by definition, as a signatory and recipient – was already in rightful and proper possession of his own Partnership Agreement.

## B. Allegations regarding Disclosure of Confidential Materials

The Board has alleged that Brian Manookian violated various Rules of Professional Conduct by purportedly disclosing discovery materials to the media and to Jonathan King in violation of a protective order. But Mr. Manookian disseminated those materials to the media prior to the entry of any protective order, and thus, could not have violated an order that did not yet exist. And Mr. Manookian has never provided any discovery materials from the *Chase* matter to Jonathan King.

At the Final Hearing, the Board has the burden of proving that Mr. Manookian disseminated specific materials to specific third-parties on specific dates falling after the entry of the protective order. The Board cannot do so, because Brian Manookian did not do so. The Board will not put on a single witness with personal knowledge as to when Mr. Manookian distributed the discovery materials other than Mr. Manookian. This is despite the Board's ability to subpoena the media outlets as well

10

as Jonathan King if the Board truly believed they were provided materials by Brian Manookian in violation of a Court Order.

Even more fundamentally, and as briefed extensively in Mr. Manookian's Motion for Rule 37.02 Sanctions, the Board still refuses to identify with any specificity the very materials it accuses Mr. Manookian of disclosing. Because the Board will not and cannot demonstrate that Mr. Manookian disclosed confidential discovery materials prior to the entry of a protective order, this Count should be dismissed.

## C. Allegations regarding Motions to Recuse

The Board has alleged that Brian Manookian violated the Rules of Professional Conduct by twice seeking the recusal of Judge Michael Binkley from the *Chase* matter. Mr. Manookian's position on this matter is briefed in his Second Motion for Partial Summary Judgment. Both Motions to Recuse were based on well-founded, non-frivolous facts.

The First Motion to Recuse sought disqualification of Judge Michael Binkley after Mr. Manookian learned that Judge Binkley had stated his pre-judged conclusions of the case before him to Senior Judge Acree. The Second Motion to recuse sought disqualification of Judge Michael Binkley after Mr. Manookian learned that Judge Binkley had been accepting non-campaign gifts and items of value during the course of the litigation from one of the law firms representing the

11

Non-parties. Both Motions to Recuse were pursued for a proper purpose. Mr. Manookian would have arguably been negligent in his representation had he failed to act on the concerning facts he learned regarding Judge Binkley.

The Board's allegations with respect to Mr. Manookian's Motions to Recuse are not only unfounded, they are frivolous. Mr. Manookian promptly moved to disqualify Judge Binkley upon discovering facts that (1) Judge Binkley himself should have disclosed to the parties and (2) that Mr. Manookian believed in good-faith required recusal under the Judicial Code of Conduct. This is not a violation of the Rules of Professional Conduct, nor should attorneys be punished for seeking to uphold the Judicial Code of Conduct. The Counts of the Second Supplemental Petition related to Mr. Manookian's Motions to Recuse should be denied.

## III. THE SPEECH COMPLAINTS

The remaining counts seek to twist and pervert various Rules of Professional Conduct into vehicles with which to punish Mr. Manookian over the content of his truthful, out-of-court speech that the Board finds objectionable. But that is simply not permitted under the United States or Tennessee Constitutions.[6] ("State action

---

[6] At various times, the Board has also sought to cast Mr. Manookian's objectively non-threatening speech as "threats" or "veiled threats." Simply labeling communications as such does not permit the Board to regulate otherwise protected speech. State entities may only act to punish "true threats, which encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343 (2003).

that punishes the publication of truthful information can rarely survive constitutional scrutiny." *Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 102 (1979). "Disciplinary rules governing the legal profession cannot punish activity protected by the First Amendment, and that First Amendment protection survives even when the attorney violates a disciplinary rule he swore to obey when admitted to the practice of law." *Gentile v. State Bar of Nevada*, 501 U.S. at 1054 (1991)).

In *Ramsey v. Board of Professional Responsibility*, the Tennessee Supreme Court considered whether a prosecutor could be discipline for making impermissible "remarks to the public" that were "gross, disrespectful, knowingly false, derogatory, and damaging to the legitimacy of, and trust in, the judicial system." *Ramsey v. Board of Professional Responsibility*, 771 S.W.2d 116 (Tenn. 1989). The Petition in that matter charged that Appellant's remarks constituted "conduct adversely reflecting upon [his] fitness to practice law, unprofessional conduct, and conduct rendering [him] unfit to be a member of the bar." *Id.* at 120

Ramsey's principal argument was that each of his remarks is fully protected under the First Amendment of the United States Constitution and the Freedom of Speech clause of the Tennessee Constitution, Article I, Section 19. The Tennessee Supreme Court agreed, holding that:

> The remarks made by Appellant were disrespectful and in bad taste;
> however, we agree with the Hearing Panel that the right of free speech

13

is "broad enough to protect these expressions" made by the Appellant. Use of the Disciplinary Rules to sanction the remarks made by General Ramsey in this case would be a significant impairment of First Amendment rights. *Ramsey v. Board of Professional Responsibility,* 771 S.W.2d at 122 (Tenn. 1989).

All of the Board's allegations regarding Mr. Manookian's speech target truthful, out-of-court speech. This is significant in two major respects. First, the government – except in narrowly proscribed circumstances – may not act to punish the publication of truthful information.[7] Secondly, while the government may undoubtedly regulate and punish speech that takes place in-court, the Tennessee Supreme Court has repeatedly drawn a distinction with speech that takes place out-of-court. *See, e.g., Board of Professional Responsibility v. Slavin,* 145 S.W.3d 531, 548-551 (Tenn. 2004)("We note that our Court held in *Ramsey v. Board of Professional Responsibility* that an attorney who made out-of-court statements to the media regarding judicial proceedings was not subject to discipline, and the statements were protected by the First Amendment. That case, however, is distinguishable. In the case under submission, the statements at issue were made during in-court judicial proceedings."); *see also, Board of Professional*

---

[7] Those narrowly proscribed circumstances include conduct such as publishing classified, national security information.

14

*Responsibility v. Parrish,* (Tenn. Aug. 14, 2018) ("This Court has in past disciplinary proceedings distinguished between in-court and out-of-court statements in determining whether the First Amendment protects an attorney's speech. In *Board of Professional Responsibility v. Slavin,* we held that pejorative statements made by an attorney in motions and other pleadings filed in state and federal courts were not entitled to First Amendment protection.").

The Board simply does not have the power to regulate and punish Mr. Manookian's truthful out-of-court speech. The Board is not ignorant of this fact. It was a party to the leading cases on this principle. For this reason, and those enumerated below, the Hearing Panel should reject the counts of the Petition, Supplemental Petition, and Second Supplemental Petition seeking to impose discipline on Mr. Manookian for the content of his speech.

### A. Email referencing Laura Gideon

The Board has alleged that Brian Manookian violated Rule 4.4 in sending an email to Clarence Gideon referencing his adult daughter's employment with William Morris Endeavor ("WME").

As a threshold and dispositive matter, Rule 4.4 applies only to conduct undertaken in the representation of a client. Mr. Manookian's email to Clarence Gideon had nothing to do with any case, legal matter, or client of either Mr. Manookian or Clarence Gideon. No client authorized or requested Mr. Manookian

to send the email. Likewise, the email does not reference any case, legal matter, or client, and the entirety of its content is limited to non-legal related matters. As such, Rule 4.4 has zero applicability.

Moreover, the email is comprised entirely of truthful statements of fact. There is simply nothing within the content of the email that the Board is permitted to regulate or punish. The Board's decision that it finds Mr. Manookian's speech objectionable does not trump the United States Supreme Court and Tennessee Supreme Court's overwhelming directives that truthful, out-of-court speech may not be punished or retaliated against.

Because the email was not sent in the representation of a client, it cannot be violative of Rule 4.4. Furthermore, because the content of the email consists entirely of truthful statements of fact, the Board may not act to punish it. Finally, the Board has conclusively admitted in response to Requests for Admission that there was no consequence or damage to Laura Gideon as a result of the email. The Board's requests for discipline arising out of the Gideon email should be rejected.

## B. Court filing referencing Jake Gideon

The Board has alleged that Brian Manookian violated Rules of Professional Conduct by describing his prior representation of Jake Gideon in a filing in the *Shao* matter. As a threshold matter, the Board initiated this Complaint on its own. The actual client, Jake Gideon, has never alleged that Brian Manookian improperly

16

disclosed any information about him or caused him any harm; nor has Jake Gideon ever voiced anything other than satisfaction with Mr. Manookian's successful representation of him.

The Board's interpretation of the Rules of Professional Conduct underlying this charge are unconstitutional because Mr. Manookian is accused only of discussing matters that had been previously revealed in public judicial proceedings and, therefore, were protected by the First Amendment. *See, e.g., Hunter v. Virginia State Bar,* 285 Va. 485, 497-498 (2013) (holding that "a lawyer is no more prohibited than any other citizen from reporting what transpired in the courtroom. This, the circuit court did not err in concluding that [the Board]'s interpretation of Rule 1.6 violated the First Amendment."

Because Mr. Manookian only reported information from a publicly filed and concluded judicial proceeding, his actions are protected by the First Amendment and the Board may not punish him for such. *See, Gentile v. State Bar of Nevada,* 501 U.S. at 1054 (1991)) ("At the very least, [the] cases recognize that disciplinary rules governing the legal profession cannot punish activity protected by the First Amendment, and that First Amendment protection survives even when the attorney violates a disciplinary rule he swore to obey when admitted to the practice of law.").

17

## C.  Emails with Phillip North and Steve North

On June 20, 2018, Mr. Manookian was taking a deposition in a medical malpractice case, *Shao v. Smith*, in Tennessee state court, in which he represented the plaintiff. The defendant, a physician, was represented by lawyer Phillip North. During the deposition, Mr. Manookian received a voicemail from Phillip North's brother, who is a retired Davidson County Circuit Court Judge, Steve North. The voicemail stated:

> Brian, this is Steve North.  I read with interest the article in the Nashville Post with regard to your controversy with Judge Brothers.  I have some information that be of some help to you, and if you would give me a call at [number] I would be happy to discuss it with you. Thank you.

Judge North was referring to an article about Mr. Manookian's motion for recusal of a current county judge, Judge Thomas Brothers, who was presiding over the *Shao* case. Mr. Manookian returned Judge North's call the same day. Judge North provided Mr. Manookian concerning information about Judge Brothers that bore on Mr. Manookian's motion for recusal.

Mr. Manookian—who had never met Judge North—did not want to proceed based on the information provided to him without first authenticating its source.  As a result, Mr. Manookian sent the voicemail to Phillip North and asked him to confirm that the voice in the recording was his brother, Judge North.

18

As a business practice at his law firm, Mr. Manookian uses software that determines when emails and attachments have been opened by recipients. Phillip North did not respond to Mr. Manookian's email, but he opened the email and the attached recording repeatedly. Accordingly, Mr. Manookian emailed Phillip North again and asked him a second time to confirm whether Judge North was, in fact, the speaker in the voicemail.

Again, Phillip North did not respond. However, Judge North did. Judge North stated that he had seen Mr. Manookian's characterizations of what Judge North had said and believed that those characterizations were not accurate.

Mr. Manookian was unsure what to think: Judge North—someone he did not know personally—had contacted him to provide information implicating another judge as having engaged in improprieties bearing directly on a pending motion for recusal. Now, however, Judge North appeared to be retracting his claims.

Mr. Manookian replied by recounting details of what Judge North had said, and he copied members of the press in the hopes of either compelling an honest response or relying on the fourth estate to ferret out the accuracy of his statements and vindicate the public interest. He wrote:

> Phillip,
>
> I see that my email and attachments are being repeatedly opened at the IP address associated with the consumer Comcast cable account for [address], Madison, Tennessee.

19

That address is the residential property where you have consistently lived with your parents (other than for a brief period of time from 1984-1986 where you rented unit [number] at [address]) until the North Family Trust essentially gifted you the property for $10.00. Upon investigation, this gifted piece of property in North Nashville, given to you for $10 by your parents, represents the sole piece of real property you own at 68 years of age.

Further confirming that you have read my email, records additionally reflect that Mona Dale Cornwell North -- the woman for whom you left your wife and two minor daughters (Nicki and Neely) -- has registered a Jeep Grand Cherokee ([VIN], TN License Plate [number]) at the same address your parents gave you and where my email is being viewed.

Please simply reply and confirm your brother Steve North's voice.

The Board has alleged that Brian Manookian violated multiple Rules of Professional Conduct in sending a series of emails to Phillip North, including the one above. The Board has further alleged that Brian Manookian has violated other Rules of Professional Conduct simply by recounting the information relayed to him by Steve North about Judge Brothers.

For the reasons above, these Counts should be rejected. Brian Manookian's emails consist entirely of truthful, out-of-court speech which the Board is not permitted to regulate. As the United States Supreme Court has held time and again, "[s]tate action that punished the publication of truthful information can rarely survive constitutional scrutiny." *Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 102 (1979). But, again, that is precisely what the Board seeks to do here. Its attempts

20

should be rejected, just as the Tennessee Supreme Court rejected similar efforts in the *Ramsey* case.

## IV.  CONCLUSION

Recognizing that it would not be able to secure discipline in the normal course against Mr. Manookian based on its unconstitutional attempts to punish his speech, the Board acted to temporarily suspend him in September of 2018 long in advance of this Final Hearing.  Mr. Manookian has now served a cumulative of over twelve months of suspension of his law license for the allegations described above prior to ever having a hearing on the merits, and without the Board alleging, much less demonstrating, that his actions have resulted in even an iota of harm to any third-party.

Now that his day in court has arrived, the claims against Mr. Manookian should be rejected outright.  For all of the above reasons, Mr. Manookian requests that he be found not to have violated any Rule of Professional Conduct.

Respectfully submitted,


Brian Manookian
45 Music Square West
Nashville, TN 37203
T: 615.266.3333
F: 615.266.0250


## CERTIFICATE OF SERVICE

I hereby certify that a copy of this document has been served by fax on the following:


Board of Professional Responsibility
Russ Willis
10 Cadillac Drive, Suite 220
Brentwood, TN 37027
T: 615.361.7500
F: 615.367.2480

This 17th day of February 2020.


Brian Manookian


22